**AD HOC COMMITTEE ON CONSUMER PROTECTION, Plaintiff,**

v.

**The UNITED STATES of America, the Interstate Commerce Commission, and the Penn-Central Railroad, et al., Defendants.**

**Civ. A. No. 766–70.**

United States District Court,
District of Columbia.

March 30, 1970.

---

Jacob P. Billig, Norman C. Barnett, Benny L. Kass, and William L. Gardner, Washington, D. C., for plaintiff.

Fritz R. Kahn, Deputy Gen. Counsel, and Arthur M. Toback, Attorney, Interstate Commerce Com'n, for defendant Interstate Commerce Commission.

Carl Helmetag, Jr., Philadelphia, Pa., and Paul F. McArdle, Washington, D. C., for defendant Penn Central Railroad.

Before WRIGHT and LEVENTHAL, Circuit Judges, and WADDY, District Judge.

PER CURIAM.

### FINDINGS OF FACT

1. Plaintiff is organized and functions as a non-profit unincorporated consumer protection association to help protect consumers who reside in the District of Columbia, and has been granted leave to proceed in this proceeding *in forma pauperis.*

2. Defendants are the United States of America, the Interstate Commerce Commission and several railroads engaged in the transcontinental transportation of fresh vegetables and melons from origins in western states to all of the principal eastern cities, including the District of Columbia.

3. Defendant railroads had published certain tariffs, to be effective August 2, 1969, applicable to the transcontinental rail-car and trailer-on-flat-car movement of vegetables and melons. Such tariffs would have restructured the rates applicable to the subject traffic by eliminating for the first time all 100-pound rates and continuing in effect only per-car charges, which in most instances were substantially increased.

4. Several interested parties, including several food chains and plaintiff herein, filed protests in July of 1969 with the Commission requesting that the subject tariffs be suspended and placed under investigation. By order of July 30, 1969, the Interstate Commerce Commission's Suspension Board, acting pursuant to Section 15(7) of the Interstate Commerce Act, 49 U.S.C. § 15(7), suspended the subject rates and ordered an investigation therein. The investigation proceeding was entitled Vegetables and Melons, Transcontinental Eastbound, I & S Docket No. 8486.

5. Pursuant to a request by the protestants, Division 2 of the Commission, by order of October 10, 1969, ordered the Commission's Bureau of Enforcement to participate in the proceedings for the purpose of developing the record with respect to certain practices that respondents alleged to be improper and unlawful. In its order, the Division noted:

As one aspect of this proceeding, the Eastern rail carriers may be contemplating adoption of damage claim set-

tlement policies concerning the "guaranteed scheduling" of vegetables and melons transported from Western origins to the markets at the major Eastern destinations, which settlement policies and "guaranteed" or "assured schedules" may have the attributes of an additional transportation service or privilege.

6. Hearings were held in the I & S 8486 proceeding in Washington, D. C., on December 2–5, 8–11, and 16, 1969. At the hearings, defendant railroads admitted, as also shown by undisputed documents taken from their files and entered into evidence by the Commission's Bureau of Enforcement, that as a condition to the effectiveness of the subject rates the practice was to be resumed by the eastern railroads of making market decline damage payments with respect to portions of the subject traffic received by the eastern wholesale markets. These payments were to be made, notwithstanding any question of negligence on the part of the railroad, with respect to produce which failed to arrive at market in accordance with guaranteed schedules, and the market price for the commodity on the date of arrival is lower than the price on the "guaranteed" date of arrival.

7. These market decline damage payments were not applicable to approximately 80% of the vegetables and melons destined for eastern markets which were purchased by the major food chains F.O.B. origin. However, it is estimated, and verified by defendant railroads' own documents admitted into evidence in the I & S 8486 proceeding, that the amount of the payments to be made could exceed millions of dollars annually.

8. Before the Commission, plaintiffs and other protestants argued that the payment of these market decline damages was unlawful in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; Section 1 of the Elkins Act, 49 U.S.C. § 41; and Section 6 of the Interstate Commerce Act, 49 U.S.C. § 6. Specifically, they argued that the market decline damage payments violated the Elkins Act in

that they were rebates to a limited class of shipping interests and that since they were not set forth in the tariffs of the railroads, they violated Section 6 of the Interstate Commerce Act. Finally, they argued that since the railroads were acting in concert to set the rates and to resume the market decline damage payments as a condition thereof, such was violative of Section 1 of the Sherman Act since they—

(a) Were entered into outside the scope of their antitrust immunity agreements under Section 5a of the Interstate Commerce Act, 49 U.S.C. § 5b;

(b) Were in any event unlawful and not immunizable under Section 5a; and

(c) That the rate bureaus failed to use the procedures set forth in their Section 5a agreements in establishing the rates.

9. On January 26, 1970, a petition was filed with the Commission to reject the tariffs as *per se* unlawful. The petition was denied on February 9, 1970. Thereafter, on February 25, 1970, a petition for reconsideration of that denial was filed, but to date no action has been taken thereon.

10. In its complaint filed herein, plaintiff has attached a copy of a newspaper article, which appeared in the February 25, 1970 *Washington Evening Star*, which reports that on February 24, 1970, the Chairman of the Board and President of the Penn Central Railroad met in a private meeting with the Commissioners of the Interstate Commerce Commission and discussed that railroad's financial situation.

11. At oral argument before the District Court on March 13, 1970, defendant Interstate Commerce Commission submitted to the court an affidavit of the Commission's Chairman admitting that the private meeting had occurred, and not denying that the Commissioners of Division 2 were present at those discussions, or that any of the matters reported in the newspaper article were discussed.

12. On February 25, 1970, a decision was made in I & S 8486 by the Commission's Division 2 (one Commissioner not participating), served March 11, 1970, holding the subject tariffs to be just and reasonable, except insofar as they violated Rule 66(a) of the Commission's tariff circular, 49 C.F.R. § 1300.66(a), requiring carriers to charge for the size car requested by a shipper. The Division ordered the railroads to comply with Rule 66(a) by April 13, 1970, thus establishing, in the absence of the filing of a petition for reconsideration, in excess of a 30-day period in which the public would be without the protection of Rule 66(a), deemed necessary by the Division. If a petition for reconsideration of the I & S 8486 decision is filed by any party to the I & S 8486 proceeding, the April 13, 1970 Rule 66(a) compliance date would be stayed by operation of law, under Section 17(8) of the Interstate Commerce Act, 49 U.S.C. § 17(8), until disposition thereof by Division 2 or the full Commission. The February 25, 1970 Division 2 report also noted that the market decline damage payments were not unlawful in violation of the Elkins Act and Sections 2, 3 and 6 of the Interstate Commerce Act. As to the allegations under Section 1 of the Sherman Act, the Division found that the resumption of the market decline damage payments was not illegal and was not the *quid pro quo* for the rate increase; hence there was no requirement, the Division found, that the railroads follow their procedures under Section 5a. As to the question of whether the establishment of market decline damage payments in concert violated Section 1, however, the Division noted that it was not for it to construe the antitrust laws and noted that protestants may be able to avail themselves of their remedies at law.

13. Plaintiff in its pleadings before this court and during oral argument has stated that the Division decision, insofar as it attempted to answer the questions of illegality under Section 6 of the Interstate Commerce Act, Section 1 of the Elkins Act, and Section 1 of the Sherman Act, is hopelessly inadequate in its findings and is contrary to the record before the Commission and applicable law. Specifically, plaintiff argued as follows:

(1) That the Commission erred by not requiring rejection of the subject tariffs because of their failure to comply with Rule 66(a) of the Commission's tariff circular. The absence of a provision in the railroads' tariff requiring compliance with Rule 66(a) allows the railroads to charge approximately twice the rates for larger size cars, notwithstanding the fact that the shipper requires and has only ordered a smaller car. Also, plaintiff noted that the Commission's order requiring the inclusion of a Rule 66 provision by April 13, 1970 may be of no consequence, since if a petition for reconsideration is filed by any party to the I & S 8486 proceeding, the April 13, 1970 date would be indefinitely stayed under the provision of Section 17(8) of the Interstate Commerce Act, 49 U.S.C. § 17(8), until further disposition of the proceeding.

(2) That the Commission erred in failing to even mention unrebutted documentary evidence taken from defendants' own files and unrebutted testimony of witnesses testifying in support of defendant carriers, which showed that the reinstitution of market decline claims policies by the eastern railroads was the consideration, or *quid pro quo*, for the rate increase. The documentary evidence referred to was secured by the Commission's Bureau of Enforcement and entered into evidence at the proceeding. Also, plaintiff pointed to unrebutted testimony from members of the Western Growers Association (T. 1029–1030 and 1299–1300); and that of the railroad witness Henry W. Large; and interoffice memoranda from the B & O Railroad (Exhibit P to Exhibit HE–19), noting that the resumption of the "guaranteed schedules" was to be conditioned upon the rate increase.

(3) That the Commission erred in finding, contrary to documentary evi-

dence taken from the railroads' files, and not discussed in the report, that the resumption of market decline payments would be an especially costly policy, and would be particularly pernicious with respect to the consumer since they are not deducted from any transportation bill but paid directly back to the shipper after the movement from which they arise is completed.

(4) That the Commision erred in finding that the practices of the respondents do not amount to the providing of special services for any shipper or group of shippers.

(5) That the Commission erred in failing to make findings required by the facts of record and applicable law with respect to the antitrust allegations made before the agency.

14. The subject tariffs were scheduled to go into effect as of 12:01 a. m. March 1, 1970. Pursuant to a request by the Commission, the railroads by letter of February 20, 1970, voluntarily postponed the effective date until March 16, 1970, at 12:01 a. m.

15. The section under which the subject tariffs were suspended, Section 15 (7) of the Interstate Commerce Act, allows the Commission, prior to the service of an order, to suspend rates for a period of 7 months. The statute further provides that "the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible." 49 U.S.C. § 15(7).

16. On March 13, 1970 the complaint herein was filed along with an application for a temporary restraining order, and motion for preliminary injunction. Therein plaintiff requested review of the I.C.C. decision denying its petition for rejection of the subject tariffs. It further requested injunctive relief against the defendant railroads to prevent violations of Section 1 of the Sherman Act, Section 1 of the Elkins Act, and Section 6 of the Interstate Commerce Act.

17. In its complaint, plaintiff also alleges that the *ex parte* communications between the officials of the Penn Central Railroad and the Commissioners of the Interstate Commerce Commission were serious violations of due process, the Administrative Procedure Act, and the Commission's own Rules of Practice and Procedure.

18. The Commission's Rules of Practice regarding prohibited *ex parte* communication provide:

(c) "Ex parte communication concerning the merits" includes both oral and written communications, but the following classes of ex parte communications shall not be prohibited:

\* \* \* \* \* \*

(2) Any oral or writen communication of facts or contentions which have general significance for an industry subject to regulation if the communicator cannot reasonably be expected to know that the facts or contentions are material to a substantive issue in a pending on-the-record proceeding in which he is interested.

49 C.F.R. § 1100.4 (Appendix C).

19. Plaintiff has submitted to the court during argument the verified statement of the railroads' chief witness, Henry W. Large, in I & S 8486 which shows that the general financial condition of the Penn Central Railroad was principally relied upon by the defendant railroads in seeking approval of the rates under investigation in that proceeding.

20. Plaintiff has filed an affidavit of its Chairman alleging that if the subject tariffs were allowed to go into effect, the prices on the subject commodities will substantially increase as a consequence of this rate adjustment; and that if the tariffs are ultimately judged unlawful, there is no conceivable way in which consumers could recoup the amounts paid as a consequence thereof. In this affidavit it was further stated that the alleged violations of the Elkins Act whereby favored shippers receive preferential rate treatment is also *per*

se injurious to consumers, particularly since the vast majority of the commodities involved herein, purchased by consumers, are not accorded such preferential treatment.

It was also alleged that the public generally is also immediately and irreparably injured by the reported *ex parte* communications made by officials of the Penn Central Railroad Company to members of the Interstate Commerce Commission with respect to facts and contentions material to issues pending before the Commission in the I & S 8486 and Docket No. 35231 proceedings. In this respect, plaintiff alleges that complete confidence in the integrity of the administrative process, including the Interstate Commerce Commission, is essential; and that failure to assure such confidence, by granting the relief requested herein, will only add to the frustrations of this community.

21. The matter was referred to the Honorable Judge Joseph C. Waddy, who after hearing of the application for temporary restraining order found that the "ends of justice would be served" by granting plaintiff's request for relief, but that the court had no jurisdistion to do so on the basis of Arrow Transportation Co. v. Southern Railway Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963).

22. On the evening of March 13, 1970, plaintiff appealed to the United States Court of Appeals for the District of Columbia Circuit requesting summary reversal of the District Court order. The court deferred action on the motion pursuant to representation by counsel for the railroad that it would be physically impossible to countermand the order to implement the new tariffs in the 53 hours remaining before the tariffs were scheduled to go into effect. On March 16, 1970, the Court of Appeals heard argument, and on March 17, 1970 rendered an order denying the motion for summary reversal and remanding the matter to the District Court for certification to the Chief Judge of the United States Court of Appeals for the District of Columbia Circuit to convene a three-judge panel and to grant temporary relief as he may be advised. In its order the Court of Appeals noted—

> To the extent that appellants' suit for violation of the antitrust laws depends for relief upon an injunction against the tariffs of appellee railroads approved by the Commission in Docket No. 8486, the action must be decided by a three-judge district court.

The court further noted that the District Court's power to grant temporary relief was:

> [N]ot limited by Arrow Transportation Co. v. Southern Railway, 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963), on review of a final order of the Commission * * *. *Arrow* concerned unwarranted judicial intrusion prior to the exercise of administrative expertise; here the Commission has investigated and approved the tariffs in question thus completed its function subject to a possible motion for reconsideration under 49 U.S.C. § 17 (1963). The convening judge in exercising his discretion may consider the order of Docket No. 8486 sufficiently final for purposes of *Arrow*—especially where the Commission delayed until the end of the seven month suspension period before ruling—to permit judicial action in spite of the availability of a motion for reconsideration * * *.

23. On March 18, 1970 the District Court issued a temporary restraining order. Therein it enjoined the defendant railroads from accepting any freight, providing any services, or implementing in any way the tariffs approved by the Interstate Commerce Commission in Docket 8486 until March 30, 1970. The court also certified the matter to the Chief Judge of the District of Columbia Circuit who thereupon convened this three-judge court.

24. In compliance with the temporary restraining order, defendant railroads are applying the tariffs in effect prior to March 16, 1970.

25. On March 20, 1970, defendants moved to vacate the temporary restraining order. Hearing on this motion, and plaintiff's motion for the entering of a preliminary injunction, was held on March 23, 1970. At that hearing, defendant railroads argued that the effect of their restructuring of the tariffs would not result in increased transportation costs because shippers would fill the cars with greater quantities of produce, thus maintaining and possibly reducing unit costs. However, in reply, plaintiff pointed out to the court that there was no evidence presented in the Commission I & S 8486 proceeding that increased quantities of produce would be tendered. In fact, plaintiff referred the court to unrefuted evidence submitted by Western Grower witnesses, in the I & S 8486 proceeding, that the proposed rates would not have any effect upon the quantity of produce tendered since that would be determined by other unrelated factors, including the extent to which the produce should be loaded to preserve it in the best condition while in transit; the amount actually available for shipment and the need to apportion same among numerous accounts when available in only limited quantities, which is frequently the case; and the inability of many receivers, including even larger food chain stores, to receive larger quantities of produce, principally because of its perishable nature, than they are at present.

It was further noted by plaintiff at the March 23, 1970 hearing that the assumption that increased transportation costs would not result from the proposed restructuring depended upon the ability of the railroads to match appropriate size cars with the size loads tendered to them, which ability had not in any way been demonstrated in the I & S 8486 proceeding. Indicating the inability of defendant railroads to so "match" its cars with loads, plaintiff tendered to the court a report appearing in the March 21, 1970 issue of *The Packer*, a trade newspaper serving the produce industry, in which it was reported that as of March 18, 1970—

* * * there was some consternation on the part of light-loading vegetable shippers, especially where they were unable to secure smaller RS type cars when ordered. A shortage of refrigerator cars, including RS types, continued in western shipping districts this week.

It was additionally indicated in this March 21, 1970 *Packer* article, supporting plaintiff's allegation that the payment of the market decline damages is a condition to the subject increase rates, that concurrently with the effectiveness of these rates—

* * * Most traffic managers in the West expressed confidence at the first of the week that the eastern carriers would be honoring the agreement to re-establish assured deliveries and entertain claims on cars arriving late.

Finally, defendant railroads argued at the March 23, 1970 hearing that the Division had found in its I & S 8486 decision that consumers would not have to pay any increased costs as a consequence of this increase. However, it was noted by the court that the Commission's findings at pages 841–842 were not so phrased. In addition, the findings which were made by the Commission with respect to the effect of this increase on the consumer were premised in large part upon the tendering of larger loads by shippers and the railroads' ability to match the size of the cars to the size of the loads tendered, discussed above.

26. By order of March 23, 1970, defendants' motion to vacate the temporary restraining order was denied, and the temporary restraining order granted by U. S. District Court Judge Joseph C. Waddy on Tuesday, March 18, 1970, continued in effect, as modified by the court's March 23, 1970 order, until 4:00 p. m. on Monday, March 30, 1970, unless within such time the order for good cause is extended, or unless the defend-

ants consent that it may be extended for a longer period.

## CONCLUSIONS OF LAW

I. We intimate no findings or conclusions as to the merits of this case. The ultimate outcome of this litigation is sufficiently in doubt to justify a court of equity in staying its hand at this preliminary stage on the basis of balancing the equities: the enjoining of the new rate structure will cause substantial irreparable harm to the railroads, which far outweighs the extent of irreparable harm to the consumers of vegetables and melons which appears, on the papers before us, as a likely consequence of the denial of preliminary relief. In making this determination we have taken into account, as part of the papers before us, the representation of the defendant railroads that they will submit a tariff on or about March 31, 1970, to satisfy the requirement of defendant Commission that their new pricing structure provide Rule 66(a) of Tariff Circular No. 20 coverage protecting the per-car rates applicable to the car ordered by the shipper, and will ask that permission be granted to make this effective prior to April 13, 1970. Under the circumstances, we deny the motion for a preliminary injunction.