**SHIPPERS SERVICE COMPANY,**
Plaintiff,

v.

**NORFOLK & WESTERN RAILWAY
COMPANY, Defendant.**

No. 73 C 604.

United States District Court,
N. D. Illinois, E. D.

Feb. 18, 1975.

Lurie, Orth & Cahan, Chicago, Ill., for plaintiff.

Marvin F. Metge, Phillip Bowman, Robert Landess, Chicago, Ill., for defendant.

## DECISION

McMILLEN, District Judge.

Plaintiff has sued the defendant railroad for failure to deliver goods with reasonable dispatch. Because of the railroad's alleged negligence in failing to make delivery in time for the opening of the market in the Detroit Union Produce Terminal, plaintiff's assignors did not sell their goods until some time later. It sues for losses allegedly caused by an intervening decline in the sale price of

the goods on 105 occasions. On the basis of the evidence, stipulations, and the law, the court finds for the defendant.

There is no claim that defendant agreed to deliver for a specified market day or that the goods deteriorated during any delay but merely that the usual and customary delivery schedule was not met by defendant railroad. In the case of some shipments, plaintiff relies alternatively upon the defendant's failure to conform to the freight schedules published for several railroads in the "Official Guide of the Railways", an unofficial publication.

Plaintiff concedes that the contract between the defendant and the consignees is contained in § 2(a) of the Uniform Bill of Lading which provides in part:

> No carrier is bound to transport said property by any particular train or vessel or in time for any particular market or otherwise than with reasonable dispatch.

A further limitation is published in the tariffs for shipments originating in California and Arizona which provided that "delay for market decline purposes shall be deemed to exist only if placement occurs more than 24 hours later than the time scheduled". Plaintiff contends that this limitation violates § 20(11) of the Interstate Commerce Act (49 U.S.C. § 20(11)), as was held in Peter Condakes Co. Inc. v. Southern Pacific Co. Inc., et al., 72 C. 3121 (N.D.Ill., May 7, 1974), appeal pending. Hence it claims for losses sustained after *all* late deliveries, under the "reasonable dispatch" provision of § 2(a) of the bill of lading, *supra*. This omnibus claim of course eliminates the occasions when a "late" delivery was nevertheless sold for the market price later on the scheduled day of delivery or on the next day, but it also includes instances where delays were incurred for reasons other than the railroad's fault.

The defendant is the delivery carrier of fruits and vegetables shipped to consignees from three general locations in the western United States. For an undefined period of time, defendant has made deliveries to the consignees at a siding next to the Detroit Union Produce Terminal or at the nearby truck terminal known as Oak Wood Yards. At the latter destination the consignees send trucks to bring the produce to the market, and in both instances samples are taken into the produce terminal to display for sale to potential purchasers. If the goods arrive late, a consignee might lose sales to its competitors. If the price declined before the consignee could sell, a claim was filed and became a part of this case.

■■ Plaintiff's evidence tended to show that it was "usual and customary" for defendant to deliver goods to the Detroit terminal in time for the opening of the market. This is based on the testimony of a claim representative who had filed claims for consignees for many years. It does not follow that a failure to conform to the usual and customary practice shows a lack of reasonable dispatch on the part of any railroad for any specific shipment. Plaintiff offered no other evidence, expert or otherwise, to demonstrate that the transportation of the goods by defendant or by its connecting railroads was not done with "reasonable dispatch". Since this term in our opinion refers to the internal management and operation of the railroad, it requires proof that a given shipment was late, due to some failure on the railroad to use due diligence. See Adams Express Co. v. Hundley, 145 Ky. 7, 139 S.W. 1084, 1085 (1911).

■ On the other hand, defendant's evidence did show reasonable dispatch in meeting its schedules in general, although neither party offered evidence of the transportation of any specific load. Defendant showed that the published schedules were optimum times which were expectable but not guaranteed. These schedules were subject to delays imposed by a variety of weather conditions, working conditions, mechanical problems and other factors which could add many hours to the schedule and still

constitute "reasonable dispatch" under the circumstances. It was incumbent upon the plaintiff, in our opinion, to show what circumstances delayed a given shipment and then to show that these were either the fault of the carrier (e. g., mechanical deficiency) or that the carrier did not solve the problem with due diligence. Chicago & Alton R. R. Co. v. Kirby, 225 U.S. 155, 32 S.Ct. 648, 56 L.Ed. 1033 (1912); see also New York & Norfolk R. R. Co. v. Peninsula Produce Exchange of Md., 240 U.S. 34, 40, 36 S.Ct. 230, 60 L.Ed. 511 (1916).

■ As an example of plaintiff's failure of proof, defendant's Memorandum Exhibit A shows that some of its cars involved in plaintiff's claims arrived 15 minutes to one hour late. Plaintiff's evidence showed that the usual and customary time for hauling trailers from the Oak Wood piggy-back yard to the produce terminal varied from one-half hour to two hours, depending upon traffic conditions, availability of manpower, weather conditions and the like. In other words, plaintiff's assignors could overcome a late arrival at Oak Wood or could miss the opening market due to their own delivery problems. Yet plaintiff seeks to recover for all loss sustained by a change in market price for every car which arrived after the usual or customary hour, regardless of when the product was made available for display. The loss on these minimal late arrivals could just as well have been sustained by delays after the car was spotted or by a lack of willing buyers on a given day. See Lapidus v. Chicago, Burlington & Quincy R. R. Co., 161 F. Supp. 664, 667 (N.D.Ill.1958).

■ Other trains arrived 24, 25 and up to 41 hours after the usual and customary time, and the same type of claim is made for the market decline. On these and similar shipments from California and Arizona, the tariff allows a claim after a 24-hour delay only if the cause could have been located and a case made for lack of reasonable dispatch. No such evidence was adduced, however, plaintiff contending solely that failure to deliver at the "usual and customary" time automatically results in liability against the carrier when the market declines. For the same reasons as discussed with respect to lesser delays, plaintiff failed to sustain its burden of proof.

■ Another example of plaintiff's failure of proof is provided by the discontinuance of one of defendant's trains from its last major collecting yard in Decatur, Illinois. This train was eliminated due to lack of business, and a large proportion of the shipments which did not make the market opening are attributable to the resulting change of the usual and customary delivery times in Detroit. The elimination of this service meant that the cars which had been carried on the cancelled train now were carried to Detroit some six hours later. There was no evidence that defendant did not ship out of Decatur on the next available train, using reasonable dispatch within the confines of its existing schedule. Plaintiff would require defendant to maintain its prior service despite unprofitability. We think the argument that reasonable dispatch means maintenance of uneconomic trains proves too much and that defendant merely needed to show that it cancelled the train for *bona fide* economic reasons and used its remaining schedule and rolling stock with reasonable dispatch.

■ Plaintiff contends that defendant eliminated the train from Decatur unilaterally and that the Railway Guide schedules carried it for several months after it ceased to run. This contention is facially correct but does not impose liability upon defendant. The railroad schedules are not guarantees. They uniformly provide that they can be changed without prior notice, and § 2(a) of the bill of lading protects the railroad against claims for failure to meet particular markets. Furthermore, plaintiff as a regular customer was afforded daily information about the location of specific cars and must have known almost immediately when the Decatur train had been terminated. It cannot insist on

carriage by a train which it knew had been discontinued. If plaintiff's theory is based on negligence, recovery is barred by its contributory negligence. Cf. Lamb v. Railway Express Agency, 51 Wash.2d 616, 320 P.2d 644, 645 (1958).

 Plaintiff claims, alternatively, that the published schedules constitute evidence of usual and customary running times, and defendant contends that the schedules are optimum times based on distances and average speeds which take no account of the variables imposed by weather etc. Also the schedules are not "through" times but merely show the time on each connecting line separately, with separate intervals for switching and reassembling based on the assumption that the prior train will be on time. There is no evidence that the schedules constitute "reasonable dispatch", and we decline to hold them to be such. If the parties meant to agree that the schedules were to constitute a contract, the bill of lading could have so provided. Its implication and those of the schedules are to the contrary, by specifying that a particular market is *not* required to be met. We therefore do not agree with the holding that a mere failure to conform to a published schedule, without more, shifts the burden of proof to the railroad to show the cause of the failure, as in Condakes v. Southern Pacific Co., 295 F.Supp. 121 (D.Mass.1968); see Atlantic Coast Line R. Co. v. Georgia Packing Co., 164 F.2d 1, 3 (5th Cir. 1947).

In conclusion, it seems to us that plaintiff is attempting to shift a risk to the defendant which is part of the plaintiff's normal course of business. Produce could arrive in good saleable condition on the 5th, 6th or 7th morning, depending on its point of origin. The consignees did not have advance contracts with their customers for the delivery of specific commodities and did not know the sale price until the day of arrival. Hence the price was a matter of happenstance, sometimes higher, sometimes lower than the expected day of arrival.

There is no claim that the goods deteriorated in quality when they had to be sold the next day or that plaintiff paid demurrage but merely that the price had declined by the time of sale. Hence the time of arrival of a specific shipment in this case is not the controlling fact, but the plaintiff would impose liability on the basis of a change in the market price over which neither it nor defendant have any control. In those instances when the price increased, the plaintiff alone benefitted, and no claim is filed. This is not the kind of a situation for which the railroad should be liable in the absence of a specific agreement.

We have referred to the decision by Judge Parsons in Peter Condakes Co. Inc. v. Southern Pacific Co. Inc., et al., *supra*, p. 1227. This case does not dispose of the provision in the bill of lading which limits liability to failure to transport with reasonable dispatch. It merely dealt with the 24-hour limitation which, even if invalid, does not change the bill of lading. Plaintiff has not attempted to argue the validity or effect of the 24-hour limitation in the case at bar, contenting itself to rest on the *Condakes* case now pending in the Court of Appeals.

 Nevertheless, there is one group of claims which might be allowable even on the present state of the record, specifically those for deliveries more than 24 hours beyond the usual and customary or Railway Guide times. The I. C. C. tariff allowing such claims seems to establish a *prima facie* case for the customer "unless the carrier has evidence to establish that the delay in delivery of the shipment is attributable to causes other than carrier negligence." Ad Hoc Committee on Consumer Protection v. United States, 313 F.Supp. 119 and 317 F.Supp. 370 (D.C.Dist. of C. 1970). This provision was eliminated from the tariffs applicable to California and Arizona shipments, as of June 17, 1972, and we do not know which of the shipments in issue were covered by it, if any. If plaintiff wishes to pursue its

claim for shipments which were covered by this provision and which were more than 24 hours late, it may file a post-trial motion specifying the shipments, the reason why the claim should be allowed and the amount of each claim. Otherwise the point lacks prosecution.