SHIPPERS SERVICE COMPANY, a partnership, Plaintiff-Appellant,

v.

NORFOLK & WESTERN RAILWAY COMPANY, a corporation, Defendant-Appellee.

No. 75–1353.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 6, 1975.

Decided Jan. 22, 1976.

Rehearing and Rehearing En Banc Denied Feb. 23, 1976.

Melvin S. Cahan, Merwin R. Burman, Chicago, Ill., for plaintiff-appellant.

Marvin F. Metge, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, ADAMS,* and SPRECHER, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff, a carlot receiver and jobber of perishable produce at the Detroit [Michigan] Union Produce Terminal ("Terminal"), sued under the Carmack Amendment of the Interstate Commerce Act (49 U.S.C. § 20(11)) to recover damages for the allegedly tardy delivery of 105 shipments of fruits and vegetables from the West Coast and Arizona. Plaintiff claimed some $35,000 in damages because of declines in the market price between the times when the shipment would ordinarily arrive and the times when they actually were available for sale. Defendant was the delivering railroad within the meaning of the foregoing statute which makes a delivering carrier responsible for the entire transportation service. The district judge ordered that the issues of liability and damages be tried separately. He heard the liability phase without a jury and rendered judgment for the defendant. *Shippers Service Co. v. Norfolk & Western Ry. Co.*, 389 F.Supp. 1225 (N.D.Ill. 1975). The plaintiff appeals.

The parties stipulated to certain facts. The originating carrier prepared a bill of lading naming the plaintiff as the consignee. The produce was loaded either in railroad cars or piggyback containers which were placed on flat cars. Depending upon the origin of the shipments, the

* Circuit Judge Arlin Marvin Adams of the Third Circuit is sitting by designation.

produce was transported by several railroads until it was delivered to the defendant at Kansas City and St. Louis, Missouri, from which the cars were taken to Decatur, Illinois. From Decatur, the defendant carried the produce to its Oakwood Yards facility outside Detroit. At the Oakwood Yards, the flatcars were placed at an unloading ramp where the piggyback containers were transferred to trucks for delivery to the Terminal. The railroad cars were transported directly to the Terminal.

The bill of lading is the governing contract between the parties. Section 2(a) provides that the carriers are bound to transport the property with "reasonable dispatch." See *New York, Philadelphia & Norfolk R. Co. v. Peninsula Produce Exchange,* 240 U.S. 34, 40–41, 36 S.Ct. 230, 60 L.Ed. 511. Plaintiff's trial theory was that each shipment arrived beyond the customary and usual or scheduled time and that this constituted a violation of Section 2(a). Plaintiff's injury occurred because the shipments missed at least one market; damages are sought for the difference between the market price at the scheduled arrival time and at the actual sale. Plaintiff attempted to establish liability by two methods. First, plaintiff introduced evidence of the usual and customary or scheduled arrival time and then showed that the actual delivery was late. Second, plaintiff sought to introduce evidence, based on internal railroad files, which would show where delays had taken place along the various routes.

Through its prime witness, Albert E. Ellenson, who runs a traffic bureau specializing in pursuing claims against railroads on behalf of perishable receivers at Detroit, the plaintiff showed that the usual and customary transportation time from the pertinent origin points to the Terminal was the fifth, sixth or seventh morning delivery, depending upon the particular route. Ellenson also discussed, based on the Official Guide of the Railways, the scheduled arrival times for the shipments involved. In most instances, the scheduled transportation times and the usual and customary transportation times coincided. Railroad cars were planned for placement at the Terminal at 5:00 a. m. Mondays and 6:00 a. m. Tuesdays through Fridays; piggyback trailers were scheduled for pickup by truckers by 7:00 a. m. at the latest. The schedules were designed to have the produce available at or near the opening of the market.

The Terminal opened at 6:00 a. m. on Mondays and at 7:00 a. m. on Tuesdays through Fridays. The removal of the piggybacks from the ramp at the Oakwood Yards to the Terminal would take from a minimum of 45 minutes to a maximum of one and one-half hours; to unload the railroad cars, plaintiff's employees needed about one-half hour. At the Terminal, the biggest part of the business is gone after 8:00 a. m. A reporter for the United States Department of Agriculture would visit plaintiff's auction floor between 8:00 a. m. and 8:30 a. m. for quotations which were used in preparing a market newsletter. If the produce was delayed, the plaintiff would be forced to sacrifice the merchandise or watch it deteriorate. Thus plaintiff contends that the defendant is liable for any decline in market price when it fails to meet its schedules.

The plaintiff then introduced evidence with respect to each of the 105 shipments, which showed the trailer or car number, the place of origin, the routing, the date and hour of shipment, the date and hour of arrival of the piggyback containers at the Oakwood Yards, and the date and hour of arrival of the railroad cars at the Terminal. Under plaintiff's theory, each of the shipments was late.

The defendant rebutted plaintiff's evidence by claiming that the applicable tariff, if valid, prohibited liability unless the delay was more than 24 hours, and that the schedules were optimum, not guaranteed times. Note 2 of Tariff 44–P provided in pertinent part that "Delay for market decline purposes shall be deemed to exist only if placement occurs more than 24 hours later than the

time scheduled to elapse between origin tender and destination placement * * * ." Note 12 of Tariff 64–N was to the same effect.[1]

Defendant also elicited testimony from railroad employees who explained the difficulties of operating railroads and the problems of scheduling trains. The evidence was intended to show the potential for delays inherent in the cross-country transportation of the goods so that it would be unreasonable to equate reasonable dispatch with compliance with the schedules. To establish liability, the railroad contended, the plaintiff must show the cause for the delays.

As a subsidiary issue, the plaintiff contended that the defendant's cancellation of a train constituted a breach of its duty to transport the goods with reasonable dispatch. Some of the 105 shipments in question had formerly moved from Decatur, Illinois, to Detroit, Michigan, on Train KSD–14. This train was not operated to Detroit from mid-1970 but was not removed from defendant's schedule until May 22, 1971. The defendant countered this claim, arguing that because the plaintiff, according to the stipulated facts, was informed of the movements of the cars on a daily basis, the plaintiff must have been aware of the change almost immediately.

The second element of plaintiff's evidence attempted to show the points in the delivery of the produce at which delays occurred. The parties stipulated that:

"Plaintiff was informed of the location of each railroad car and trailer on flat car at various points while same were enroute between origin and destination, and upon arrival at the Oakwood Yard[s] of Defendant, arrival at Detroit Union Produce Terminal of railroad cars and arrival at the piggyback facilities in Defendant's Oakwood Yards in Detroit, Michigan of trailers on flat cars."

To show the reasons for the delays, the plaintiff then attempted to introduce into evidence the claim files of the defendant on the 105 shipments. The files contained information with regard to the movements of the shipments gathered by the defendant from communications with the other carriers. The court refused to admit the files, sustaining defendant's hearsay objection.

In its opinion, referring to Mr. Ellenson's testimony, the district court acknowledged that plaintiff's evidence "tended to show that it was 'usual and customary' for defendant to deliver goods to the Detroit Terminal in time for the opening of the market." However, the court held that merely showing the failure to meet the usual and customary time for delivery was not sufficient to create an inference that the railroad had failed to move the produce with reasonable dispatch. Rather, it was incumbent upon the plaintiff "to show what circumstances delayed a given shipment and then to show that these were either the fault of the carrier (e. g., mechanical deficiency) or that the carrier did not solve the problem with due diligence." Similarly, the trial court held that a failure to conform to published schedules did not shift the burden of proof to the railroad to show the cause of the delay. The court thus held that to prove a breach of the duty to transport with reasonable dispatch, the burden is on the plaintiff to establish that the delay is the fault of the railroad. We disagree and reverse.

With respect to Train KSD–14 from Decatur, Illinois, to Detroit, Judge McMillen noted that the train was elimi-

---

1. These tariffs were invalidated by our decision in *Peter Condakes Co., Inc. v. Southern Pacific Co.,* 512 F.2d 1141, 1144 (7th Cir. 1975). The defendant does not urge us to reconsider that holding.

Because of the 24-hour period of grace allowed for delivery in Notes 2 and 12 to the applicable tariffs, the district court, after ruling for defendant on most of the shipments, granted plaintiff permission to pursue its claims with respect to "deliveries more than twenty-four hours beyond the usual and customary or Railway Guide [scheduled] times." Plaintiff did not accept this invitation. The issue is now moot by virtue of the foregoing decision.

nated due to lack of business, resulting in delivery in Detroit "some six hours later." Since the stipulation of facts states that plaintiff was informed of the location of each railroad car and trailer at various points while enroute, the district judge found that plaintiff "must have known almost immediately when the Decatur train had been terminated" and therefore held it could not recover for delayed deliveries caused by the discontinuance of this train.

■ The primary task before us is to determine what constitutes a breach of the duty to transport with reasonable dispatch. We adhere to our holding in *Peter Condakes Co., Inc. v. Southern Pacific Co., supra,* that a railroad's own schedules constitute *prima facie* evidence of the obligation imposed by Section 2(a) of the bill of lading to transport "with reasonable dispatch." It therefore follows that to make out a *prima facie* case of a breach of this duty, the plaintiff need prove timely delivery of the goods to the carrier, the scheduled time of arrival and the fact of the delay. See *Missouri Pacific R. Co. v. Elmore & Stahl,* 377 U.S. 134, 138, 84 S.Ct. 1142, 12 L.Ed.2d 194; *Fraser-Smith Co. v. Chicago, Rock Island & Pacific R. Co.,* 435 F.2d 1396, 1398 (7th Cir. 1971). Upon demonstrating these three elements of the case, the burden shifts to the railroad to adduce evidence that the delays were justified or reasonable under the circumstances. *Fraser-Smith Co. v. Chicago, Rock Island & Pacific R. Co., supra; Condakes v. Southern Pacific Co.,* 295 F.Supp. 121 (D.Mass.1968).

We cannot accept the defendant's argument that schedules are optimum and not guaranteed times. *Peter Condakes Co., Inc. v. Southern Pacific Co., supra.* If the railroads cannot meet their published times for delivery, their remedy is to promulgate more realistic schedules. None of the authorities cited by the railroad is to the contrary.

Defendant relies on *Goliger Trading Co. v. Chicago & Northwestern Ry. Co.,* 184 F.2d 876 (7th Cir. 1950). In that case the shipper did not introduce any proof as to schedules or as to the reasonable and customary time required for the transportation involved. Similarly *Lapidus v. Chicago, Burlington & Quincy Railroad Co.,* 161 F.Supp. 664 (N.D.Ill. 1958), is distinguishable. There the consignees knew that the faster schedules were experimental and were unable to show that the deliveries were not in accord with custom and practice.

The burden to come forward with an explanation for the delay properly belongs on the defendant. The shipper surely cannot be expected to know what caused the tardiness. The railroad has within its knowledge the data necessary to relieve it of the liability imposed by law and the bill of lading; it should be required to prove these facts. *Missouri Pacific R. Co. v. Elmore & Stahl, supra,* 377 U.S. at 143–144, 84 S.Ct. 1142. The rule of law adopted by the district court places an unrealistic burden on the shipper. To identify the origin and reasons for the delay, the shipper would have to comb the files of all carriers that handled the produce.[2] However, this is a task which the defendant is best suited to accomplish by virtue of the agreement which the participating carriers have entered into for handling freight claims.[3] Any other result, we believe, is inconsistent with the purposes of the Carmack Amendment. See *Reider v. Thompson,* 339 U.S. 113, 119, 70 S.Ct. 499, 94 L.Ed. 698.

■ We do not agree, as the defendant contends, that it is unfair to require

2. The burden on the shipper becomes grossly unfair where, as here, the plaintiff is prohibited from introducing into evidence the defendant's claim files. To comply with the rule of law advanced by the district court, the shipper would have to subpoena records of each carrier separately. As a practical matter, either because of the expense or jurisdictional problems, this requirement could prevent the shipper from ever recovering its losses.

3. See plaintiff's Exhibit 7 which was received in evidence; see also *Chicago, Milwaukee, St. Paul & Pacific R. Co. v. Acme Fast Freight,* 336 U.S. 465, 482, 69 S.Ct. 692, 93 L.Ed. 817.

the railroad to explain even the shortest delay. The burden in such cases will not be great. The defendant may be able to show that the consignees could have made the delayed cars ready in time for the auction market despite the railroads' delay. A "default of the shipper" would seem to exculpate defendant from responsibility under Section 1(b) of the bill of lading.[4] Further, although the delay may be sufficient to establish liability, the railroad may offer an exculpatory explanation. Also, to recover, the plaintiff must still show that the tardiness was the proximate cause of the injury it has suffered. *Great Atlantic & Pacific Tea Co. v. Atchison, Topeka & Santa Fe Ry. Co.,* 333 F.2d 705, 710 (7th Cir. 1964), certiorari denied, 379 U.S. 967, 85 S.Ct. 661, 13 L.Ed.2d 560. Except in volatile markets, minor delays will not engender great damages.

For these reasons, the judgment of the district court must be reversed.[5] However, it would be unfair to reverse the judgment below without remanding for another trial on the issue of liability because the controlling law of this Circuit was not settled until our *Peter Condakes Co.* opinion was handed down soon after the present trial.[6]

Reversed and remanded for new trial.[7]

---

4. Section 1(b) provides in part:

"No carrier shall be liable for * * * delay caused by the * * * act or default of the shipper * * *."

5. Plaintiff submits that its Group Exhibit 2, consisting of defendant's entire claim files with respect to these shipments, and Group Exhibit 5, charts based on those files, were improperly excluded as hearsay. Plaintiff attempted to introduce these exhibits to show the place and reasons for the delay. In view of our holding that upon proof of noncompliance with the railroad's schedule, the burden shifts to the defendant to explain the delay, the plaintiff will have no need to introduce these files at trial. We therefore need not address this issue.

6. On the basis of the stipulated facts, defendant will not be responsible for delayed shipments caused by discontinuance of Train KSD–14 from Decatur (if it can again show business necessity therefor) because the stipulation shows plaintiff must have known of the change even though the schedule was not officially changed until much later. If the same stipulation of facts is not used at the new trial, plaintiff of course might be able to show that it did not know of the cancellation of Train KSD–14.

7. Since one trial has already occurred with respect to liability, Circuit Rule 23 will apply.