## CHICAGO, I. & L. RY. CO. v. INTERNATIONAL MILLING CO.
### No. 8775.

Circuit Court of Appeals, Eighth Circuit.
July 30, 1930.

W. O. Rogers, of Minneapolis, Minn., and B. G. Stackhouse, of Chicago, Ill. (J. B. Faegre, of Minneapolis, Minn., and C. P. Stewart, of Cincinnati, Ohio, on the brief), for appellant.

Harold G. Simpson, of Minneapolis, Minn. (Ernest W. Erickson, of Minneapolis, Minn., on the brief), for appellee.

Before KENYON, BOOTH, and GARDNER, Circuit Judges.

KENYON, Circuit Judge.

This is an action to recover unpaid charges on a certain interstate shipment of grain and grain products from the Northwest to Louisville, Ky. The shipment had a transit

privilege which was exercised at Sioux City, and the car then moved through Chicago and on to Louisville, appellant being the carrier from Chicago to Louisville. Appellee paid the supposed freight rate to Louisville from point of origin in the Northwest country, and included in this was a 10 cent per hundred weight charge for the haul from Chicago to Louisville. Appellant in this suit attempts to collect 17 cents per hundred weight, claiming that to be the correct rate. A jury was waived in writing and the trial court found in favor of appellee.

This case involves a controversy as to what tariff was in effect at the time of this shipment, viz., between November 28, and December 8, 1925. The facts are no wise in dispute. Effective October 20, 1924, Jones tariff, 100-R, I. C. C. 1569, was issued by one Jones as agent of many carriers, including appellant, which named a rate of 17 cents for the transportation from Chicago to Louisville, Kentucky, of grain products originating in the Northwest.

Appellant contends this tariff was the one applicable to this shipment.

Effective November 28, 1925, appellant published and filed on October 22, 1925, with the Interstate Commerce Commission (hereinafter called the commission) its Chicago, Indianapolis & Louisville freight tariff 520-C, which canceled a number of tariffs including Chicago, Indianapolis & Louisville Railway freight tariff No. 520-B, and named a rate of 10 cents per hundred on grain products of the Northwest from Chicago to Louisville. Appellee's contention is that this is the proper tariff to be applied to this shipment.

Tariff 520-C canceled tariff 520-B, I. C. C. 4209, which was effective September 6, 1923, and which named rates on grain products from Chicago to various points. Tariff 520-B throws no light on this controversy. It refers for rates to Jones tariff 100-P, I. C. C. 1388. Jones Tariff 100-P is not in this record, although it is stated that 100-R is a reissue of 100-P. 100-R states "portions of I. C. C. No. 1388 under suspension." There is nothing to show what is suspended. To avoid confusion of thinking it must be kept in mind that there were two Jones tariffs, 100-P and 100-R. In any event Jones tariff 100-R was effective October 20, 1924, which is subsequent to the time that tariff 520-B was effective. While the argument could be made that tariff 520-C in canceling tariff 520-B canceled the Louisville rate in Jones tariff 100-P, it could not successfully be con-

tended that it canceled such rate in Jones tariff 100-R which was published and filed after 520-B. The consideration of tariff 520-B is unimportant in any way, and may well be pretermitted.

There are two questions here:

(1) Was the rate of 17 cents per hundred weight from Chicago to Louisville fixed by Jones tariff 100-R applicable to this shipment, or was the 10-cent rate claimed to have been established by tariff 520-C applicable?

(2) Under the circumstances is appellant estopped from asserting that the rate under tariff 520-C is not the legal rate?

Our answer to the first question makes unnecessary the consideration of the second.

Appellant's contention is that the rate of the Jones tariff 100-R for shipments of grain products from Chicago to Louisville was never canceled in the manner provided by the rules of the Interstate Commerce Commission and hence remained the legal rate at the time of this shipment, notwithstanding a different rate had been duly filed and published in tariff 520-C, which was effective if at all prior to this shipment.

It is the theory of appellee that tariff 520-C was filed and published as provided by paragraph 3, section 6, title 49, USCA; that this established the legal rate to which the shipper was entitled, notwithstanding that such tariff did not conform strictly to the rules of the commission.

Section 6, title 49, USCA, provides for the filing of schedules of rates, fares, and charges with the Interstate Commerce Commission, and the printing and keeping open of such schedules to public inspection. Paragraph 3 of said section provides that changes in such rates shall be made as follows:

"No change shall be made in the rates, fares, and charges or joint rates, fares, and charges which have been filed and published by any common carrier in compliance with the requirements of this section, except after thirty days' notice to the commission and to the public published as aforesaid, which shall plainly state the changes proposed to be made in the schedule then in force and the time when the changed rates, fares, or charges will go into effect; and the proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time and kept open to public inspection."

Where a tariff of rates is filed with the commission and published in the manner provided by law, the rates therein established

are the legal rates. Texas & Pac. Ry. Co. v. Cisco Oil Mill, 204 U. S. 449, 27 S. Ct. 358, 51 L. Ed. 562; Kansas City S. Ry. Co. v. C. H. Albers Commission Co., 223 U. S. 573, 32 S. Ct. 316, 56 L. Ed. 556. Such tariff is treated in respect to such rates as a statute. Pillsbury Flour Mills Co. v. Great Northern Ry. Co. (C. C. A.) 25 F.(2d) 66.

The rate of 10 cents per hundred weight, as provided in tariff 520–C, was the legally established rate, unless the failure of appellants to follow strictly the rules of the commission with regard to the form of cancellation of previous tariffs made such tariff ineffective.

It is suggested in argument that the courts cannot interfere with the commission in connection with the establishment of rates, and that the 17-cent rate cannot be set aside by the court. The doctrine is established, as said by the Supreme Court in Kansas City Southern Ry. Co. v. United States, 231 U. S. 423, 456, 34 S. Ct. 125, 136, 58 L. Ed. 296, 52 L. R. A. (N. S.) 1, that: "So long as it [Commission] acts fairly and reasonably within the grant of power constitutionally conferred by Congress, its orders are not open to judicial review." We are not dealing here with any question of power to invade the administrative functions of the commission, or one involving a review of a rule or order of the commission. We are simply inquiring as to what tariff was in effect at a certain time. The commission has been given broad administrative powers by Congress to supervise carriers in interstate commerce. It is purely an administrative body exercising some quasi judicial duties. While Congress has not and could not delegate to it legislative power, yet some of its regulations may have the force and effect of law. In Interstate Commerce Commission v. Humboldt Steamship Co., 224 U. S. 474, 32 S. Ct. 556, 559, 56 L. Ed. 849, it is said: "Its functions are defined, and, in the main, explicitly directed, by the act creating it." It is not easy sometimes, as suggested by the Supreme Court in United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563, to draw the line between legislative power to make laws and administrative authority to make regulations.

It is apparent that appellant's theory that tariff 520–C never became effective is based on Circular 18–A of the commission effective March 31, 1911. Its title is as follows:

"Regulations Issued by the Interstate Commerce Commission, Under Authority of Section 6 of the Act to Regulate Commerce as Amended June 18, 1910, to Govern the Construction and Filing of Freight Tariffs and Classifications, and Passenger Fare Schedules, by Common Carriers Wholly by Railroad or Partly by Railroad and Partly by Water, as Defined in said Act."

The part of the circular relied on by appellant is:

"8. (a) If a tariff or supplement to a tariff is issued which conflicts with a part of another tariff or supplement to a tariff which is in force at the time, and which is not thereby canceled in full, it shall specifically state the portion of such other tariff which is thereby canceled, and such other tariff shall at the same time be correspondingly amended, effective on the same date, in the regular way; that is, by reissue, if tariff is of less than 5 pages, and by reissue or supplement, if tariff is of more than 5 pages. Such reissue or supplement must state where rates will thereafter be found and must be filed at the same time and in connection with the tariff which contains the new rates. It will not be necessary to give on commodity tariff or supplement reference to class-rate tariffs that may be affected, nor to give on class-rate tariffs or supplements reference to commodity tariffs, except as provided in Rule 56.

"(b) An agent who acts under power of attorney is fully authorized to act for the carriers that have named him their agent and attorney, and, therefore, it is permissible for him to cancel by his tariffs issues of such principals.

"A carrier may not by its individual tariff cancel, amend, or modify a tariff filed by a duly authorized agent, except when corresponding amendment to such agent's tariff is filed at the same time and as per paragraph (a) of this Rule."

Do these rules of Circular 18–A have the force and effect claimed by appellant?

Is a schedule of rates duly filed with the commission by a carrier and published as by statute provided ineffective and illegal because it does not strictly conform to the rules of Circular 18–A?

We are not here dealing with or passing on rules, regulations, or conference rulings of the commission other than rule 8 of Circular 18–A hereinbefore set out.

The authority to make rules was by virtue of paragraphs 3 and 6 of section 6, title 49 USCA, which are as follows:

"(3) * * * Provided further, That the commission is authorized to make suitable rules and regulations for the simplification

of schedules of rates, fares, charges, and classifications and to permit in such rules and regulations the filing of an amendment of or change in any rate, fare, charge, or classification without filing complete schedules covering rates, fares, charges or classifications not changed if, in its judgment, not inconsistent with the public interest."

Paragraph 6 of section 6, provides as follows:

"(6) Forms of schedules prescribed by commission. The commission may determine and prescribe the form in which the schedules required by this section to be kept open to public inspection shall be prepared and arranged and may change the form from time to time as shall be found expedient."

In Texas & Pacific Ry. v. Abilene Cotton Oil Co., 204 U. S. 426, 437, 27 S. Ct. 350, 354, 51 L. Ed. 553, 9 Ann. Cas. 1075, the court said: "It was made the duty of carriers subject to the act to file with the Interstate Commerce Commission created by that act copies of established schedules, and power was conferred upon that body to provide as to the form of the schedules, and penalties were imposed for not establishing and filing the required schedules."

If Rule 8 of Tariff Circular No. 18–A of the commission is to be given the effect claimed by appellant, then Jones tariff 100–R as to the Louisville rate from Chicago was not canceled by 520–C, as it did not specifically in terms cancel such rate in that tariff, nor was there any corresponding amendment to such tariff filed at the same time. If the 10-cent rate under 520–C was not properly established, it seems to be assumed that the Jones rate under 100–R of 17 cents would apply, although we do not know from the record whether the Jones tariff 100–R properly canceled all tariffs before that time which might be applicable to this shipment.

Congress provided in section 6, title 49, USCA, for the filing and posting of tariff rates. In paragraph 3, heretofore cited, of said section, it provided how these rates could be changed. The statute is plain. It would seem that, where a tariff had been established under a law of Congress and which tariff had the force and effect of a statute, that a circular issued by the Interstate Commerce Commission to the carriers in the exercise merely of its administrative functions prescribing the form or wording of schedules could not circumscribe or make that tariff ineffective. Certainly authority does not rest with the commission to override acts of Congress. The authority granted under paragraphs 3 and 6, § 6, supra, is not to destroy but to simplify rate schedules by prescribing forms therefor and to permit filing changes in rates without filing complete schedules including rates not changed.

The commission has many times held that a tariff rate lawfully published continues to be the rate until a subsequent tariff is filed and published which contains a provision canceling in terms the previous rate according to the rules of the Commission. New Albany Box & Basket Co. v. Illinois Central R. R. Co., 16 I. C. C. 315; Jewel Tea Co. v. Penna. Co., 46 I. C. C. 314; Dewey Portland Cement Co. v. A., T. & S. F. Ry. Co., 56 I. C. C. 444; Highland Iron & Steel Co. v. B. & O. R. R., 57 I. C. C. 547. These decisions are of course not binding on the courts, though entitled to most respectful consideration. There are decisions by state courts to the same effect. Illinois Cent. R. Co. v. Van Dusen-Harrington Co., 170 Minn. 488, 212 N. W. 940, 214 N. W. 278; McCaffrey Bros. Co. v. C., B. & Q. R. Co., 114 Neb. 382, 207 N. W. 503. We are unable, however, to find any case in a federal appellate court holding that, where a new tariff naming different rates is filed and published as provided by statute, it is not effective because of its failure to state in specific terms that the previously established rate is canceled.

Undoubtedly some of the rules of the Interstate Commerce Commission, fairly within the powers expressly conferred by Congress, have the force and effect of statutes. That is not true as to every rule it adopts, and in determining the question of the force and effect of any rule regard must be had, not only to the specific authority granted by Congress, but also to the purpose and intent of the rule—as to whether it relates merely to matters of form, or is substantive in its nature.

Fullerton Lumber Co. v. Chicago, M., St. P. & P. R. Co. (C. C. A.) 36 F.(2d) 180, was a case where a carrier accepted a check in payment of freight charges and did not present the same until after the bank had closed its doors. The carrier was held entitled to recover its freight charges under a rule of the commission which provided that nothing but money could lawfully be received or accepted in payment for transportation whether of passengers or property. The trial court said such rule had the force and effect of a United States statute, and this court approved the statement. That rule affected the shipper as well as the carrier. It was not a mere rule as to procedure in filing tariffs.

There is no room for argument on the proposition that a rate legally established remains so until changed *in the manner provided by law.* The troublesome query is, What is "the *manner provided by law?*" Is it the rules of procedure adopted by the commission, such for instance as set forth in section 8, Circular 18–A? The commission and some of the state courts say it is. Or, is it the statute enacted by Congress providing the method of changing rates? If Congress has provided the way in which changes in tariff rates are to be made, can the commission say that changes so made are not in the manner provided by law because the carrier has failed to follow the rule of the commission as to form of schedules?

In Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 437, 439, 27 S. Ct. 350, 354, 51 L. Ed. 553, 9 Ann. Cas. 1075, the court, in speaking of the established schedule remaining unaltered, says: "Until the same were changed as authorized by the act," and "which should not be departed from so long as the established schedule remained unaltered in the manner provided by law." In Robinson v. B. & O. R. Co., 222 U. S. 506, 32 S. Ct. 114, 56 L. Ed. 288, the court refers to rates in the schedules as the legal rates "until changed as provided in the act." In United States v. Miller, 223 U. S. 599, 605, 32 S. Ct. 323, 325, 56 L. Ed. 568, the court refers to the act as providing: "That rates once lawfully established shall not be changed otherwise than in the mode prescribed." The method provided by the statute itself is certainly "in the manner provided by law." Courts have not permitted rates legally established to be easily destroyed.

In American Express Co. v. United States Horse Shoe Co., 244 U. S. 58, 37 S. Ct. 595, 61 L. Ed. 990, it was held that failure to post rates which were duly filed with the Interstate Commerce Commission and published does not affect their validity or the duty of a shipper to take notice of them. Kansas City Southern Ry. Co. v. Albers Commission Co., 223 U. S. 573, 32 S. Ct. 316, 56 L. Ed. 556, holds that posting the schedule of rates of interstate carriers as required by section 6 of the Interstate Commerce Act is not essential to make the rate legally operative. In United States v. Miller, 223 U. S. 599, 604, 32 S. Ct. 323, 325, 56 L. Ed. 568, the difference between publica-

tion of rates and posting of rates is drawn. Publication is necessary to give validity to the rates—posting is not. The court says: "Publication is a step in establishing rates, while posting is a duty arising out of the fact that they have been established." Posting of rates under these decisions is not an essential thing. In these cases the rates had been established by publication and filing just as the rate was in this case. The question of posting, like the question of the form in which the schedule should be preserved on the records of the commission, does not enter into the legality of the rate.

In Berwind-White Coal Mining Co. v. Chicago & Erie Railroad Co., 235 U. S. 371, 35 S. Ct. 131, 59 L. Ed. 257, it was held that the filing with the Interstate Commerce Commission of the book of rules as to demurrage of the Car Service Association, of which the railroad was a member, containing a statement of what its rates were, was a compliance with the provisions of the act to regulate commerce requiring the filing of tariff sheets, no objection being taken to the form and the documents being adequate to give notice, and there being proof of posting.

It may be observed that 520–C was filed with the commission without any objection being made to its form. There is no claim it was not filed and published as provided by law. Its rates were those held out to the shipper. Had it used the words, "former Jones Tariff, 100–R, canceled as to the Louisville rate," presumably this lawsuit would not have been brought. Even if rule 8 of Circular 18–A had the force and effect of a statute, it would not supersede paragraph 3, § 6, of the statutes heretofore cited, which established the method of changing rates. There were no directions to the shipper under said rule 8—they were to the carriers. The failure to follow the rule was entirely the failure of the carrier. The fact that tariff 520–C did not conform to rule 8 of Circular 18–A of the commission, in that it failed to state that the previously established rate was canceled, was not sufficient in our judgment to render it ineffective; nor was the failure to file a corresponding amendment to Jones tariff 100–R. We think the trial court did not err in holding that the proper rate to be applied to this shipment was that provided in tariff 520–C. Its judgment is affirmed.