**AD HOC COMMITTEE ON CONSUMER PROTECTION, Plaintiff,**

v.

**UNITED STATES of America, Interstate Commerce Commission and Penn Central Railroad et al., Defendants.**

**Civ. A. No. 766–70.**

United States District Court,
District of Columbia.

Sept. 18, 1970.

Jacob P. Billig, Norman C. Barnett, Benny L. Kass and William L. Gardner, Washington, D. C., for plaintiff.

Fritz R. Kahn, Deputy Gen. Counsel, and Arthur M. Toback, Atty., I. C. C., for defendant Interstate Commerce Commission.

Carl Helmetag, Jr., Philadelphia, Pa., and Paul F. McArdle, Washington, D. C., for defendant Penn Central Railroad.

Asst. Atty. Gen. Richard W. McLaren, Thomas A. Flannery, U. S. Atty., and Howard E. Shapiro, George Edelstein and Robert B. Nicholson, Attys., Dept. of Justice, for defendant United States.

Before WRIGHT and LEVENTHAL, Circuit Judges, and WADDY, District Judge.

### PER CURIAM:

The background of this litigation is disclosed in detail in our prior opinion in this case reported at 313 F.Supp. 119. Before this court now is the single question whether the railroads were required by Section 6(1) of the Interstate Commerce Act [1] to include in their tariffs the guaranteed scheduling policy as to fresh vegetables and melons to which they had agreed with the Western Growers Association.[2] Without passing on the validity of that agreement, we find that the failure to include it in the tariffs violates Section 6(1) of the Act.[3]

Under the agreement the railroads would be liable for shipper losses resulting from a delay in delivery in excess of 24 hours. In return the Western Growers Association agreed not to oppose the rate increases in the railroad tariffs. From the language of the agreement [4] it appears that the railroads' guaranteed scheduling policy is designed to help the Western Growers Association whose members ship east to auction or wholesale markets rather than food market chains which buy directly from growers and ship east for immediate distribution

1. 49 U.S.C. § 6(1) (1964).

2. The Commission orders under review emanate from Commission Docket No. 35231 and Investigation and Suspension Docket No. 8486. They approve the tariffs in suit.

3. Protestants before the Commission made a broad attack on the railroads' guaranteed scheduling policy. As stated by the Commission:

 "Protestants contend more specifically (1) that what respondents purpose, for the benefit of a limited group of shippers, is to make payments for market decline claims, irrespective of negligence —in effect, an illegal rebate of a portion of the transportation rates, in violation of section 1 of the Elkins Act; (2) that this claim payment arrangement or agreement is violative of section 6 of the Interstate Commerce Act, as well as section 1 of the Elkins Act, because the terms of that arrangement are not published in the tariff of which it is an essential element; (3) that since no specific charge is being published for the guaranteed delivery service—what is in effect a special service for a limited group of preferred shippers —the proposed rates are unjustly discriminatory and unduly preferential in violation of sections 2 and 3 of the Interstate Commerce Act; (4) that establishment of guaranteed delivery service, in conjunction with the new claim pay-

 ment policy of the eastern railroads, would lead the carriers, in the handling of produce cars at destination terminals, to prefer those cars destined to auction markets, since only those shippers or receivers would benefit from the new policy and generate market decline claims; and (5) that, by protestants' estimates, the annual costs of this new claim payment policy would be more than $4 million, or more than half the estimated revenues sought in the present rate proposals."

4. The scope of the railroads' undertaking with respect to the "guaranteed scheduling" contemplated in connection with their new rate structure is set forth as part of the rate proposal forwarded by Baxter (Chairman of the Traffic Executive Association-Eastern Railroads) to Prueter (Chairman of the Trans-Continental Freight Bureau), HE–19, Ex. EE, p. 4:

 "(8) The recommended rates will be subject to an agreement that railroads will set up schedules to produce assured deliveries at major Eastern destinations which have recognized market operations under which railroads will be liable for market decline claims when shipments are not placed in time for sale at the market by or before opening of the market on the day following the day on which car should have arrived under established freight schedules."

to their retail outlets. In its answer the United States, the statutory defendant in this case,[5] concedes that the Commission erred in not rejecting the tariff schedules filed by the railroads as not conforming to the requirements of Section 6(1). We agree.

Section 6(1) requires railroads to file schedules "showing all the rates, fares, and charges for transportation * * * [which] shall * * * state separately * * * all privileges or facilities granted or allowed, and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the * * * shipper or consignee." Section 6(7) prohibits railroads from engaging in transportation of passengers or property unless Section 6(1) is complied with.

 The fundamental safeguard against discrimination in transportation under the Act is public disclosure of charges for all services through the system of filed tariffs required by Section 6. To prevent circumvention Section 6(1) explicitly requires that the tariff separately state all privileges or facilities granted or allowed and any rule which affects any part of the rates or the value of the service rendered. We think that in the circumstances of this case[6] the guaranteed scheduling policy of the railroads was a privilege or facility granted shippers which affected the rate and the value of the service.

The guaranteed scheduling policy is the price the railroads paid to eliminate opposition from the Western Growers Association to the rate increases included in the tariff. On prior occasions the Association had successfully opposed rate increases before the Commission. Hence to obtain Commission approval of the increase here it was important that this opposition be at least neutralized. This was accomplished by the railroads' commitment to deliver produce within 24 hours of scheduled delivery. This commitment is a special transportation service not even referred to in the tariffs filed with the Commission. Then Commission Chairman Tucker advised the Western Growers Association that "agreement by carriers to dispatch for arrival and delivery at a specified date and time obviously constitutes agreement to render a special service, which to be lawful requires tariff support." HE–19, Ex. 4, pp. 3–4. And the Commission's own Bureau of Enforcement in these proceedings advised the Commission that the guaranteed scheduling in this case is a separate valuable service which requires tariff authorization.[7] See 335 ICC 791, 805. The Commission, however, was otherwise persuaded.

In briefs filed with this court both the Commission and the railroads argue that the railroads' guaranteed scheduling policy does not commit the railroads to pay damages resulting from delay in delivery in excess of 24 hours, that under the policy the railroad will pay only where the railroad has no evidence by which it could establish freedom from negligence. This interpretation of the policy is interesting, but at the very least it seems to depart from the language of the agreement reached by the railroads and the Western Growers Association.[8] Moreover, the Commis-

5. 28 U.S.C. § 2322 (1964).

6. We are aware that the Commission is presently engaged in a general rule making proceeding inquiring into carrier rules governing the processing of damage claims. Nothing we say here is intended to prejudice that inquiry. We decide this case on its facts.

7. Apparently the Bureau of Traffic took a somewhat different, though perhaps not necessarily contradictory, approach from that of the Bureau of Enforcement. If we understand the matter aright, the Bureau of Traffic does not want claims undertakings to clutter up the tariff books. Our opinion does not prohibit the Commission from arranging for this aspect of the railroads' undertaking in a separate book or place, so long as it is part of the published tariff.

8. See, Note 4, supra.

sion's lawyers' and the railroads' attempt to place this gloss on the agreement demonstrates the wisdom of the Section 6(1) requirement that any railroad rule which affects the value of the service to the shipper be separately stated in the tariff. By making the rule public and explicit the Commission and the courts can begin by knowing exactly what is offered, and then determining whether it is legal and, just as important, whether it is being evenly applied. A policy that is amorphous and non-public has obvious potentialities as a source of discrimination, particularly where the policy is the *quid pro quo* to certain shippers who assisted the railroads in obtaining a rate increase.

Since we are in agreement with the concession of the statutory defendant that Section 6(1) required that the railroads' guaranteed scheduling policy be separately stated in the tariffs, we remand this case to the Commission for further not inconsistent proceedings.

So ordered.