**ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, et al., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

No. 78–2184.

United States Court of Appeals, Seventh Circuit.

Argued April 9, 1979.

Decided Oct. 22, 1979.

Richard J. Flynn, Washington, D. C., for petitioners.

Christine N. Kohl, I. C. C., Washington, D. C., for respondents.

Before FAIRCHILD, Chief Judge, SWYGERT, Circuit Judge, and JAMESON, Senior District Judge.*

JAMESON, Senior District Judge.

In this action for review, filed pursuant to 28 U.S.C. §§ 2321 and 2342, petitioners (a number of railroads and the Association of American Railroads) seek to set aside an

---

* The Honorable William J. Jameson, Senior District Judge of the United States District Court for the District of Montana is sitting by designation.

order of the Interstate Commerce Commission requiring railroads to publish tariffs setting forth operating schedules between major terminals and interchange points.[1]

### I. Proceedings Before Interstate Commerce Commission

In 1970 and 1971 various railroads sought and obtained increases in their tariffs. In these "general rate" cases,[2] numerous shippers complained of rail service deficiencies. In response to the shipper complaints, the Interstate Commerce Commission (ICC), on November 5, 1971, instituted a massive investigation into all aspects of railroad carrier service. (Ex Parte No. 270, (Sub—No. 2)). All railroads subject to the jurisdiction of the Commission were made respondents in this proceeding. A former member of the Commission was appointed Coordinator of the investigation. Written statements were solicited and received from rail carriers, shippers, and other interested parties, including the Special Projects Staff (SPS) of the Commission's Bureau of Enforcement. In 1975 the proceeding was reopened to receive additional comments.

On April 2, 1976, the Coordinator filed a comprehensive report,[3] in which he made 14 findings, including as Finding No. 3 that the railroads "should be *requested* to prepare and publish service schedules . . .".

345 ICC at 1310.[4] (Emphasis added.) Exceptions to the Coordinator's Report were filed by petitioners, shippers, and the SPS. The full Commission then considered the Coordinator's Report, the exceptions thereto, and prior reports.

The Commission in its decision of July 19, 1978, provided, *inter alia*, that "tariff" publications of railroad operating schedules involving transportation of nonperishable commodities between major terminals and interchange points be *required*.[5] If carriers did not comply by publishing their operating schedules within 210 days, the Commission would take "such further action as may be necessary". 345 ICC at 2969–70. It is this portion of the Commission's order petitioners seek to set aside.

### II. Contentions on Petition for Review

Petitioners contend that (1) the Commission is without jurisdiction to require railroads to publish operating schedules in "tariff form"; (2) if the ICC did have jurisdiction to require tariff publication of operating schedules, there is no rational basis in the record to support this requirement; and (3) if the ICC did have jurisdiction, it has lapsed because of the failure to conclude the investigation within the time prescribed by Section 17(14)(b) of the Interstate Commerce Act, 49 U.S.C. § 17(14)(b).[6]

1. The Report and Order of the Commission was entered on July 19, 1978, amended July 28, 1978, in Ex Parte No. 270 (Sub. No. 2), Investigation of Railroad Freight Service, 345 ICC 2941 (1978).

2. Ex Parte Nos. 265 and 267, Increased Freight Rates 1970 and 1971, 339 ICC 125 (1971).

3. Ex Parte No. 270 (Sub. No. 2), Investigation of Railroad Freight Service, 345 ICC 1223 (1976).

4. Because of serious legal obstacles the Coordinator recommended that the railroads would be requested, rather than required, to publish freight service schedules. The Coordinator believed any schedules would have to be published in tariff form and, thus, would subject the carrier to possible civil and criminal liability if the published standards were not met. 345 ICC 2951.

5. Based on the Special Project Staff's conclusion that railroad liability already existed under other laws, the Commission decided that carri-

er liability was not "a serious obstacle" to requiring tariff publication of freight schedules. 345 ICC at 2953.

The Commission agreed with the Coordinator that publication of dock-to-dock schedules would be unduly expensive and burdensome to the railroads. In the same proceedings, the Commission instituted another rule to develop and adopt terminal performance standards for the transportation of nonperishable commodities (Ex. Parte No. 344), and ordered the railroads to conduct service studies at major terminals, under Commission supervision, 180 days after any terminal performance regulations go into effect. The Commission also discontinued certain shipper and carrier reporting programs. Petitioners in the instant case, however, challenge only the requirement that they publish operating schedules in tariff form.

6. This Act was revised, codified, and enacted without substantive change as subtitle IV of Title 49, United States Code. See Act of Oct. 17, 1978, Pub.L. No. 95–473, 92 Stat. 1337. This opinion will refer to sections of the Act

### III. Section 6 of Interstate Commerce Act

Petitioners argue that Section 6 of the Interstate Commerce Act, 49 U.S.C. § 6, is the only section of the Act which deals with the scope and content of tariffs, and that under this section "tariffs" apply only to "rates, fares and charges" and may not be extended to include operating schedules. The Commission contends that section 6 merely sets minimum standards and that under the "modern view" of agency powers tariff publication of schedules is permissible, since it is not expressly prohibited by section 6.

It is well settled that "tariffs bind both carriers and shippers with the force of law. Under § 6 of the Interstate Commerce Act the carrier cannot deviate from the rate specified in the tariff for any service in connection with the transportation of property". *Lowden v. Simmonds, etc., Grain Co.*, 306 U.S. 516, 520, 59 S.Ct. 612, 614, 83 L.Ed. 953 (1939).[7]

Section 6 provides in pertinent part:

(1) Every common carrier subject to the provisions of this chapter shall file with the Commission . . . and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established. . . . The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, all privileges or facilities granted or allowed, and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee. . . .

. . . . . .

(3) No change shall be made in the rates, fares, and charges or joint rates, fares, and charges which have been filed and published by any common carrier in compliance with the requirements of this section, except after thirty days' notice to the Commission and to the public . . *Provided,* That the Commission may, in its discretion and for good cause shown, allow changes upon less than the notice herein specified, or modify the requirements of this section in respect to publishing, posting, and filing of tariffs, either in particular instances or by a general order applicable to special or peculiar circumstances or conditions: *Provided further,* That the Commission is authorized to make suitable rules and regulations for the simplification of schedules of rates, fares, charges, and classifications and to permit in such rules and regulations the filing of an amendment of or change in any rate, fare, charge, or classification without filing complete schedules covering rates, fares, charges or classifications not changed if, in its judgment, not inconsistent with the public interest.

. . . . .

(6) The schedules required by this section to be filed shall be published, filed, and posted in such form and manner as the Commission by regulation shall prescribe; . . . .

### (a) Plain Meaning of Statute

In construing a statute, absent persuasive reasons to the contrary, the

---

prior to recodification in order to be consistent with the Commission's decision and petitioners' and respondents' briefs.

7. See also *Pennsylvania R. Co. v. International Coal Co.*, 230 U.S. 184, 197, 33 S.Ct. 893, 57 L.Ed. 1446 (1912); *Colorado & Southern Ry.*

*Co. v. Southwestern R. & S. M. Co.*, 374 F.Supp. 24, 26 (W.D.Okla.1974), where the court noted further that "Public Policy demands strict performance of the tariff . . .."

words used in the statute are to be given their ordinary meaning. See *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *United States v. Hooper*, 564 F.2d 217, 220 (7 Cir. 1977). Petitioners contend that the explicit wording of Section 6 requires the publication and public posting of "rates, fares, and charges" and gives no authority to the Commission to require in addition the tariff publication of operating schedules. It is true, as petitioners argue, that section 6 refers repeatedly to "rates, fares, and charges". The authority granted the Commission to issue regulations is limited to the "form and manner" of publication and posting. Clearly no authority is granted by section 6 to make substantive changes in the requirements for publication and posting of tariffs.[8]

**(b) Legislative History**

We find nothing in the legislative history of section 6 to indicate that Congress intended to grant the Commission authority to require tariff publication of operating schedules. Rather it supports the conclusion that section 6 relates solely to the compulsory publication and posting of rates, fares, and charges.

The purpose of section 6 was explained in the House of Representatives when the predecessor to the present Act was first enacted in 1887:

> These, I think, are the leading features of this section, and in them, are embodied notice to all shippers as to what they are to pay upon any given commodity or quantity. It will prevent fluctuating rates, high rates today, low rates tomorrow, or vice versa—and the business of the country will be conducted with absolute knowledge as to the cost of transportation, and purchases and sales can be made and agreements entered into without speculating as to the cost reaching market.[9]

Courts examining the legislative intent of section 6 have concluded that it was "thought that notoriety of rates would militate against discrimination and preferential treatment"[10] and that the purpose of the Act in requiring tariffs containing the rates of carriers to be filed was "to secure uniformity, to secure the same treatment to all shippers alike by requiring them to pay one rate as established, published, and posted".[11]

In one of its own assessments the ICC examined the Congressional intent behind section 6.

> In the accomplishment of the chief purpose of the act to secure uniformity of treatment to all, to suppress unjust discrimination and undue preferences, and to prevent special and secret agreements in respect of rates for interstate transportation, Congress required that such rates be established in a manner calculated to give them publicity to make them inflexible while in force, and cause them to be unalterable save in the mode prescribed.[12]

**IV. *"Modern View" of Agency Powers***

Respondents recognize that section 6 does not expressly authorize the Commission to require tariff publication of operating schedules, but argue that the exercise of this authority is not prohibited by section 6 and that (1) the Commission's action is authorized by other provisions of the Interstate Commerce Act and "national transportation policy", and (2) petitioners' posi-

---

**8.** Cf. *Chicago I. & L. Ry. Co. v. International Milling Co.*, 43 F.2d 93, 96 (8 Cir.) *cert. denied*, 282 U.S. 885, 51 S.Ct. 89, 75 L.Ed. 781 (1930).

**9.** The Economic Regulation of Business and Industry: A Legislative History of U.S. Regulatory Agencies, p. 294 (B. Schwartz ed. 1973). Reprinted portion of the House of Representatives' debate; 49th Congress, 1st Session, May 22–July 20, 1886; Representative Charles O'Farrall's Section-by-Section analysis of S. 1532.

**10.** *Central & Southern Motor Frgt. Tar. Ass'n v. United States*, 273 F.Supp. 823, 832 (D.Del. 1967).

**11.** *Central R. Co. of New Jersey v. United States Pipeline Co.*, 1 F.2d 866, 868 (3 Cir. 1924).

**12.** Changes in Schedules to Meet Water Competition, 176 ICC 217, 220–21 (1931).

tion is "out of step with the 'modern view' that if a problem is within the purview of an agency, Congress intended that the agency have the power to remedy it—notwithstanding the absence of an express delegation of authority".

In support of the latter contention, respondents rely primarily upon *Warner-Lambert Co. v. Federal Trade Commission*, 183 U.S.App.D.C. 230, 237–238, 562 F.2d 749, 756–757 (D.C.Cir.1977), *cert. denied*, 435 U.S. 950, 98 S.Ct. 1575, 55 L.Ed.2d 800 (1978). *Warner-Lambert*, however, is clearly distinguishable. It involved cease and desist orders by the Federal Trade Commission and case law holding that "[a]uthority to mold administrative decrees is indeed like the authority of courts to frame injunctive decrees * * *. [The] power to order divestiture need not be explicitly included in the powers of an administrative agency to be part of its arsenal of authority * * *." [13] The Court found that a provision requiring corrective advertising was necessary to give effect to the prospective cease and desist order despite the lack of a specific provision for corrective advertising in the enabling legislation.[14]

█ Tariff publication of operating schedules is not necessary to give effect to section 6 or regulations issued pursuant thereto. The plain meaning and history of the section show that it was intended to apply only to the tariff publication of "rates, fares and charges". Simply because tariff publication of operating schedules is not prohibited does not mean that the ICC is free to make this substantive change. The "modern view" is still subject to the well recognized rule that an administrative agency cannot exceed the specific statutory authority granted it by Congress. As the Court stated in *Campbell v. Galeno Chemical Co.*, 281 U.S. 599, 50 S.Ct. 412, 74 L.Ed. 1063 (1930), "The limits of the power to issue regulations are well settled. *International R. Co. v. Davidson*, 257 U.S. 506, 514 [, 42 S.Ct. 179, 66 L.Ed. 341]. They may not exceed a statute or modify its provisions." *Id.* at 610, 50 S.Ct. at 415. The addition of "tariff" publication of operating schedules would exceed and modify the statutory requirement for publication of rates, fares and charges.

## V. Perishable Products

Likewise distinguishable are the case[15] and administrative proceeding[16] cited by respondents involving perishable products, where the requirement that the operating schedules be published in tariff form was based on the finding that section 6(1) applied because the schedules were found to be an integral part of the rates. The operating schedules in the present case were not shown to be integral elements of the rates or values of services.[17]

13. *Warner-Lambert*, citing *Pan-American World Airways, Inc. v. United States*, 371 U.S. 296, 311–312 n. 17, 83 S.Ct. 476, 9 L.Ed.2d 325.

14. The Commission had issued an order requiring a manufacturer of a mouthwash to cease and desist from advertising that its product prevented, cured, or alleviated the common cold. In addition the Commission provided that the manufacturer disclose in future advertising that its product would not help prevent colds or lessen their severity.

15. *Ad Hoc Committee on Consumer Pro. v. United States*, 317 F.Supp. 370 (D.D.C.1970). (Appeal dismissed 403 U.S. 901, 91 S.Ct. 2204, 29 L.Ed.2d 677 (1971) for want of jurisdiction.) In this case an order by the Commission requiring tariff publication of a railroad claims "policy" adopted in connection with guaranteed scheduling required publication not only of the claims policy but also publication of the train schedules upon which that policy was based.

The plaintiffs sought a determination of whether section 6(1) required that policy to be published in carrier tariffs. The court held it did. The policy had originated in an agreement between the railroads and an organization of shippers wherein the latter agreed not to oppose the late revision sought in *Vegetables & Melons Transcontinental Eastbound*, 335 ICC 798 (1970), and the railroads consented to resume voluntary payment of market decline claims when actual delivery was made more than 24 hours after scheduled time.

16. *Provisions on Vegetables & Melons Transcontinental*, 340 ICC 807 (1972).

17. It should be noted that the ICC, on March 31, 1979, exempted rail transportation of most fresh fruits and vegetables from the provisions of Subtitle IV of Title 49 (the recodification of the Interstate Commerce Act), i. e., mandatory tariff publication of operating schedules would

In *Bodine & Clark Livestock Commission Co. v. Great Northern Ry. Co.*, 63 F.2d 472, 474 (9 Cir. 1933), *cert. denied*, 290 U.S. 629, 54 S.Ct. 48, 78 L.Ed. 548 (1933), the court held that an operating rule involved in that case did not, in a practical sense, in any wise change, affect or determine any part of the rates, fares and charges that the Railroad collected from shippers or the value of the service rendered: "It is only charges or privileges or facilities that do so affect the rates that must be published, under the provisions of Section 6(1), *supra*." *Id.* at p. 476.[18]

### VI. *Other Provisions of Interstate Commerce Act and National Transportation Policy*

In contending that the Commission was authorized to promulgate the rule in question to carry out the purpose of the Interstate Commerce Act and National Transportation Policy, respondents rely heavily on *American Trucking Ass'ns, Inc. v. Atchison, Topeka & S. F. Ry.*, 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967). In particular they argue that petitioners' suggestion that the Commission may not require tariff publication of anything other than rates, fares and charges represents a "vast leap

from a particular authorization to a pervasive prohibition", citing *American Trucking*, 387 U.S. at 411, 87 S.Ct. at 1616.

*American Trucking* dealt with the railroads' claim that the Commission had no power to make "piggyback" service available to motor and water common and contract carriers, even though the railroads offered this service to the public under open-tariff publications. The railroads contended that Congress did not intend to inhibit the railroads from discriminating against motor carriers; but the Court found section 3(1) broadly prohibited any undue or unreasonable preference, and when read in light of other statutory provisions the Court found no merit in the railroads' contention that the Commission lacked authority to promulgate the rule. In particular, the Court found that the rule "in substance" paraphrased § 2 of the Interstate Commerce Act, embodying a common law carrier duty not to discriminate. *Id.* at 400, 87 S.Ct. 1608.

In the present case, however, we find no other statutory language providing authority for "tariff" publication of operating schedules, although respondents argue that sections 1(4),[19] 1(11),[20] and 1(13)[21] provide

no longer be required "since the railroads will have a pecuniary interest in adhering to expedited schedules in order to compete effectively with motor carriers for this traffic." *Ex Parte* No. 346 (Sub-No. 1) Rail General Exemption Authority—Fresh Fruits and Vegetables, —— ICC ——, n. 6. This exemption was part of a deregulation plan pursuant to 49 U.S.C. § 10505 (recodified section number) where a finding was made that regulation is not necessary, among other things, to effectuate the national transportation policy and the services are of a limited scope. Thus, the railroads would be exempt from the *Reasonable Dispatch* Rule for most commodities. *Investigation into the Need for Defining Reasonable Dispatch (Perishable Commodities)*, 355 ICC 162 (1977) and 351 ICC 812 (1976), *pending on petition for review in Association of American Railroads v. Interstate Commerce Commission*, D.C.Cir., No. 77–1961.

18. On reference from the court, the Interstate Commerce Commission considered the reasonableness and validity of an operating rule which limited westbound movements of livestock to a weekly train operated only on Saturday of each week and whether the operating

rule was to be tariff published. Part of the Commission's conclusion reads:

> In our opinion, however, the Rule assailed was no more than a train schedule for livestock, and it has never been considered necessary to include such schedules in the tariffs . . . . The inclusion of such operating Rules and *train schedules* in the tariffs would serve no useful purpose but only tend to encumber them. The act should be interpreted reasonably in light of custom and practical needs, and so interpreted, we find no requirement that an operating Rule or train schedule such as that assailed must be incorporated in the tariffs. (Emphasis added.)

19. Section 1(4) of the Interstate Commerce Act provided:

> It shall be the duty of every common carrier subject to this chapter to provide and furnish transportation upon reasonable request therefor . . . ..

20. Section 1(11) provided:
> It shall be the duty of every carrier by railroad subject to this chapter to furnish safe and adequate car service and to estab-

21. Note 21 on page 1205.

the basis for such authority. Both section 1(11) and section 1(13) refer to rules and regulations with respect to "car service". That term is defined by section 1(10):

The term "car service" in this part shall include the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, and other vehicles used in the transportation of property, including special types of equipment, and the supply of trains, by any carrier by railroad subject to this part.

The term "car service" has been held to mean "the use to which the vehicles of transportation are put; not the transportation *service* rendered by means of them". (Emphasis added.) *Peoria & P. U. R. Ry. Co. v. United States*, 263 U.S. 528, 533, 44 S.Ct. 194, 196, 68 L.Ed. 427 (1924). See also *Chicago, M. St. P. & P.R. Co. v. McCree & Co.*, 91 F.Supp. 57, 60 (D.C.1950).

In *In Re Rules & Regulations Nos. 31 & 32, 193 Nos. 59*, 193 Neb. 59, 225 N.W.2d 401 (1975), a case concerning the extent of state power over interstate transportation, the court, citing *Peoria, supra*, differentiated passenger and freight service from "car service": "Power is reserved to the states regarding only passenger and freight service, and *not* as to car service. 'Car service' connotes the use to which the vehicles of transportation are put; not the transportation service by means of them." (Original emphasis.) Thus, tariff operating schedules, directly related to transportation services, do not fall within the definition of "car service".[22] See also *Ex Parte* No. 270 (Sub-

No. 2), *Investigation of Railroad Freight Service*, 345 ICC at 1223 (investigation into alleged and admitted deficiencies in Railroad *freight* service—the study which precipitated the present lawsuit.).

Under the limited sense in which the term "car service" is used neither section of the Act relating to car service (§§ 1(11) and 1(13)) may be held to grant the Commission authority to order "tariff" publication of operating schedules.

We agree with petitioners that section 6 limits compulsory contents of tariffs to "rates, fares, and charges" and to any rule or regulation which is an integral element of the carrier's "rates, fares, or charges".

### VII. *Publication of Operating Schedules in Non-Tariff Form*

Although the Commission lacks authority under section. 6 to order the mandatory publishing of operating schedules in "tariff form", we conclude that the Commission does have authority to require the publication of operating schedules in non-tariff form.[23]

Section 1(3)(a) of the Interstate Commerce Act provides that the term "transportation" shall include "locomotives, cars . . . and all instrumentalities and facilities of shipment or carriage" and "all services in connection" with the receipt and delivery of property being transported. Section 1(4) provides that it "shall be the duty of every common carrier . . . to provide and furnish transportation upon reasonable request therefor . . .."

---

lish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; and every unjust and unreasonable rule, regulation and practice with respect to car service is prohibited and declared to be unlawful.

**21.** Section 1(13) of the Act provided:
The Commission is hereby authorized by general or special orders to require all carriers by railroad subject to this chapter, or any of them, to file with it from time to time their rules and regulations with respect to car service, and the Commission may, in its discretion, direct that such rules and regulations shall be incorporated in their schedules showing rates, fares, and charges for the

transportation and be subject to any or all the provisions of this chapter relating thereto.

**22.** See Footnote 7 in *Peoria, supra*, 263 U.S. at 533–34, 44 S.Ct. 194, for detailed discussion of the *limited sense* in which the term "car service" is used.

**23.** Petitioners state in their reply brief that, "The railroads are not opposed to *publication* of their operating schedules. They are opposed, however, to the mandatory publication of their schedules in 'tariff form.'" They contend that "such requirement will hamper, not facilitate, carrier freight transportation."

Under section 12(1), the Commission "in order to perform the duties and carry out the objects for which it was created," is "authorized and required to execute and enforce the provisions" of the Act. Publication of operating schedules is consistent with insuring adequate railroad service, an object of the national transportation policy.[24]

We agree with petitioners that there is a valid distinction between publication in "tariff" and "non-tariff" form. If the Commission could compel carriers to publish schedules in "tariff" form, Section 6(3) would require 30 days notice to the Commission and public of a proposed change, unless the Commission for good cause allowed less notice. Section 15 provides for a determination of the lawfulness of an "individual or joint rate, fare or charge", after a full hearing, on the complaint of a shipper or other interested person, or on the Commission's own initiative. Presumably this would also apply to a schedule if it were a part of the tariff.

Moreover, as noted *supra*, tariffs bind both carriers and shippers with the force of law. Tariff publication of operating schedules might well expand the potential liability of carriers to damage claims if schedules could not be met. On the other hand, if, as the Commission contends, the railroads are already subject to civil liability for failure to transport goods with reasonable dispatch, a requirement for publication in "non-tariff" form should be sufficient.

## VIII. *Conclusion*

We conclude that section 6 alone controls "tariff publication" and is limited to "rates, fares and charges". The Commission's action in ordering operating schedules to be published in "tariff form" is beyond its scope of authority. The Commission, however, in fulfilling its duties and carrying out the object for which it was created, is authorized to require the non-tariff publication of operating schedules between major terminals and points of interchange.[25]

Remanded for modification of order consistent with this opinion.

SWYGERT, Circuit Judge, dissenting.

I respectfully dissent because I do not agree with the majority that the proceedings should be remanded for the Commission to modify its order. I would affirm the Commission's decision.

If I read Judge Jameson's opinion correctly, the Commission, on remand, must modify its order so that it may require the railroads to publish their operating schedules. The railroads would not, however, be bound to maintain those schedules at the risk of a penalty at the hands of either the Commission or a court of law. In other words, schedules are to be published solely for information purposes.

One of the difficulties with the majority's approach is that operating schedules are already being published, albeit voluntarily. Mere publication, however, whether voluntary or compelled, has no teeth to it, and

**24.** The "national transportation policy," preceding Section 1 of the Act, reads:

It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy. Act Sept. 18, 1940, c. 722, Title I, § 1, 54 Stat. 899.

**25.** In view of this conclusion, we deem it unnecessary to consider the other contentions of petitioners.

this is not what the Commission desires in order to improve the efficiency of our Nation's railroad system.

The majority says that the Commission has authority under sections 1(3)(a), 1(4), and 12(1) of the Interstate Commerce Act to mandate the railroads to publish operating schedules in "non-tariff form." Apparently what this means is that a Commission rule to publish operating schedules does not fall within the rubric of "rates, fares, and charges" contained in section 6 of the Act and, therefore, it may not be enforced by investigatory/adjudicatory proceedings since only "rates, fares, and charges" ("tariff" items) are so enforceable.

Laying aside the semantic problem about the meaning of the term "tariff," which seems to some extent to be the source of the difference in views between the majority and me, I believe that because the Commission has statutory authority outside of section 6 to require the publication of operating schedules, it follows that the maintenance of those schedules may be enforced in the same manner as rates, fares, and charges.

The petitioners' principal contention is that the "Commission's regulation requiring 'tariff' publication of railroad operating schedules . . . is clearly beyond the scope of Section 6 of the Act." Pet.Br. at 18. This contention, however, begs the question. The question is: Does the Commission have authority under any of the provisions of the Act to issue the rule under attack. Clearly it does. Section 1(4) of the Act requires the railroads to provide adequate service upon reasonable request. Section 12(1)(a) requires the Commission "to execute and enforce the provisions of this chapter." Thus, statutory sources outside of section 6 give the Commission authority to mandate the publication of oper-

ating schedules. The recent revision and codification of the Act, enacted "without substantive change" belies petitioners' argument that Section 6 is the only statutory source which is relevant to the Commission rule requiring the railroads not only to mandatorily publish but to maintain operating schedules. Section 12(1)(a) corresponds to 49 U.S.C. § 10321(a)—the revised version. Section 10321(a) reads:

The Interstate Commerce Commission shall carry out this subtitle. Enumeration of a power of the Commission in this subtitle does not exclude another power the Commission may have in carrying out this subtitle. The Commission may prescribe regulations in carrying out this subtitle.

A secondary contention made by petitioners is easily answered. That the Commission's decision has a rational basis is demonstrated by both the report of the Coordinator and the decision of the Commission. Both the Coordinator and the Commission found on the basis of the evidence submitted that the shipper has a compelling need to know how long his shipment will be in transit. The Commission's response was to provide the remedy here challenged. It noted that the mandatory publication of schedules would not increase the railroads existing civil liability for failure to transport goods with "reasonable dispatch."[1] In sum, the Commission's rule is bottomed on a decision that is fully supported not only by the facts but by logical and fully-articulated reasoning.

---

1. The decision in pertinent part reads:

Both the railroads and the Coordinator expressed concern that required publication, in tariffs could expose the railroads to potential criminal and civil liability. As the Special Projects Staff pointed out, the language of the Elkins Act depends on a finding of willful violation. In addition, the railroads are already subject to civil liability for failure to transport goods with reasonable dispatch under section 20(11) of the act and the common law. Therefore, we do not find the question of liability to be a serious obstacle to the publication of freight schedules. 345 I.C.C. at 2951.