H. B. ZACHRY COMPANY, Petitioner,

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMIS-SION, et al, Respondents.

No. 80–1357
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
Unit A

March 2, 1981.

Johnston, Bowlin, Krog & Vives, Robert W. Wachsmuth, Richard L. Reed, San Antonio, Tex., for petitioner.

Carin A. Clauss, Sol. of Labor, John R. Bradley, Ben. W. Mintz, Assoc. Sol., Dennis K. Kade, Assoc. Counsel, Washington, D. C., James E. White, Reg. Sol., U. S. Dept. of Labor, Dallas, Tex., for respondents.

Before BROWN, POLITZ and TATE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This appeal is brought by H. B. Zachry Company pursuant to a petition for review of a decision of the Occupational Safety and Health Review Commission (OSHRC) in favor of the Secretary of Labor (Secretary). The Occupational Safety and Health citation alleged that Zachry had committed a serious violation of the Act by allowing its mobil crane to come within 10 feet of energized electrical transmission lines thus creating a hazard of electrical shock. An order of abatement and a $700 penalty was assessed against Zachry. Finding substantial evidence in the record to support the decision and order of the Administrative Law Judge and Commission, we affirm.

## The Facts

The facts which gave rise to the penalty imposed by the Secretary and affirmed by the Commission are uncontroverted. Zachry is a general contractor engaged in world-wide construction with its principal place of business at San Antonio, Texas. Early in 1976, Zachry was engaged in construction at the Sooner Dam and Power Plant project near Pawnee, Oklahoma.[1] At approximately eight o'clock on the morning of February 11, 1976, one of Zachry's crane operators, Raymond Kitchens, was ordered by his immediate supervisors to transport a load of pipe from a storage area to an excavation site—a distance of several hundred feet. Located approximately 28 feet above this pathway were uninsulated energized electrical transmission lines carrying 7,000 to 7,200 watts of electricity.

The load was secured by steel cables attached to the end of the pipe, wrapped around, and then fastened to a hook on the boom of the crane. With this load attached, the boom rested at an angle of about 30° to 35° with a length including the jib of approximately 48 to 50 feet. Two employees, Tobias and Fragu were assigned

---

1. Although the occurrence took place in the Tenth Circuit, Zachry elected under 29 U.S. C.A. § 660(a) to seek review of the Commis- sion's decision in the Fifth Circuit where Zachry maintains its principal offices and place of business.

to assist Kitchens in this moving operation by holding the ends of the pipe to stabilize it. As the load was being transported across the work site, the jib of the mobil crane[2] came into contact with one of the transmission lines fatally electrocuting Tobias and seriously injuring Fragu.

The following morning, Roger Jackson, an OSHA compliance officer commenced an on-site investigation pursuant to 29 U.S. C.A. § 657(a).[3] Based on this investigation, the Secretary of Labor issued a citation[4] on February 27, 1976, which alleged that Zachry had committed a serious violation[5] of 29 C.F.R. 1926.550(a)(15)(i)[6] by failing to maintain a minimum clearance of ten feet between energized electrical transmission lines and the crane or its load, thus creating the hazard of electrical shock. The citation was accompanied by the Secretary's recommendation of a $700 penalty and an order of immediate abatement of the hazard.

2. Kitchens was operating a grove full hydraulic self-propelled crane, 1972 Model RT--605—commonly known as a "cherry picker".

3. § 657. Inspections, investigations, and recordkeeping

**Authority of Secretary to enter, inspect, and investigate places of employment; time and manner**

(a) In order to carry out the purposes of this chapter, the Secretary, upon presenting appropriate credentials to the owner, operator, or agent in charge, is authorized—

(1) to enter without delay and at reasonable times any factory, plant, establishment, construction site, or other area, workplace or environment where work is performed by an employee of an employer; and

(2) to inspect and investigate during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, any such place of employment and all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials therein, and to question privately any such employer, owner, operator, agent or employee.

4. Citation No. 1, Item No. 1, 20 CFR 1926.-550(a)(15)(i) described:

"A minimum clearance of 10 feet was not maintained between the electrical distribution and transmission lines rated up to 50 KV and any part of the crane or load, where the electrical distribution and transmission lines were not de-energized nor visible grounded at the point of work or insulating barriers, not a part of or an attachment to the equipment or machinery, were not erected or installed to prevent physical contact with the lines, which resulted in a hazard of electrical shock in the following locations: Grove Truck Crane, Model RT 605, Serial Number 20176, at pumping station construction site." "Condition existed on or about February 11, 1976."

The above Citation and proposed penalty of $700.00 are to be considered in contest. The citation was a result of an inspection of the above described premise on February 12, 1976.

5. This section defines "serious violation":

§ 654. Duties of employers and employees

(a) Each employer—

(1) shall furnish to each of his employes employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

(2) shall comply with occupational safety and health standards promulgated under this chapter.

Section 17(k), 29 U.S.C. § 666(j), provides:

For purposes of this section, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

6. 29 C.F.R. 1926.550(a)(15)(i):

(a) *General requirements.* (1) The employer shall comply with the manufacturer's specifications and limitations applicable to the operation of any and all cranes and derricks. Where manufacturer's specifications are not available, the limitations assigned to the equipment shall be based on the determinations of a qualified engineer competent in this field and such determinations will be appropriately documented and recorded. Attachments used with cranes shall not exceed the capacity, rating, or scope recommended by the manufacturer.

(15) Except where electrical distribution and transmission lines have been deenergized and visibly grounded at point of work or where insulating barriers, not a part of or an attachment to the equipment or machinery, have been erected to prevent physical contact with the lines, equipment or machines shall be operated proximate to power lines only in accordance with the following:

(i) For lines rated 50 kV. or below, minimum clearance between the lines and any part of the crane or load shall be 10 feet;

*See* Appendix I for entire text.

Zachry timely contested the citation and proposed penalty pursuant to 29 U.S.C.A. § 659(c).[7] Both at the administrative hearing on July 20, 1976, and now before this Court, Zachry challenges the citation and penalty on three grounds. First, since the citation and complaint[8] allege an "inspection" rather than "investigation" of the work site, the Secretary should not have been allowed to amend the complaint and present evidence relating to the crane accident. Second, the cited standard (see note 6, supra) is not applicable to the operation which was being performed at the time of the accident. And, more importantly, the company should not be held liable for an employee's unforeseeable negligence when it has adequately trained and supervised its employees in this particular area of safety.

The Administrative Law Judge (ALJ) by decision and order of October 26, 1976, af-

firmed the Secretary's citation and $700 penalty. The same results were reached by the Review Commission on January 31, 1980.

## Our Review Standard

In considering Zachry's request to set aside the Commission's decision, we are mindful of the broad scope and remedial purpose of OSHA. *Atlas Roofing Co. v. OSHA,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977), aff'g 518 F.2d 990 (5th Cir. 1975). We are also bound by that body's findings on questions of fact and reasonable inferences drawn therefrom if they are supported by substantial evidence on the record considered as a whole even if this Court could justifiably reach a different result de novo. *See* 29 U.S.C.A. § 660(a);[9] *e. g., American Petroleum Insti-*

---

7. **Advisement of Commission by Secretary of notification of contest by employer of citation or notification or of filing of notice by any employee or representative of employees; hearing by Commission; orders of Commission and Secretary; rules of procedure**

(c) If an employer notifies the Secretary that he intends to contest a citation issued under section 658(a) of this title or notification issued under subsection (a) or (b) of this section, or if, within fifteen working days of the issuance of a citation under section 658(a) of this title, any employee or representative of employees files a notice with the Secretary alleging that the period of time fixed in the citation for the abatement of the violation is unreasonable, the Secretary shall immediately advise the Commission of such notification, and the Commission shall afford an opportunity for a hearing (in accordance with section 554 of Title 5 but without regard to subsection (a)(3) of such section).

8. *COMPLAINT*

An *inspection* has disclosed that, at the times and in the manner hereinafter stated, the provisions of section 5(a)(2) of the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651, *et seq.*), hereinafter referred to as the Act, and *Occupational Safety and Health Standards,* promulgated thereunder (29 CFR Part 1926), have been violated. It is, therefore, alleged and charged that:

I

Jurisdiction of this proceeding is conferred upon the Occupational Safety and Health Review Commission, hereinafter referred to as the Commission, by section 10(c) of the Act.

\* \* \* \* \* \*

III

As a result of an *inspection* conducted on February 11 through 20, 1976, by an authorized representative of the complainant of a workplace under the operation and control of respondent located 11 miles west and 9 miles north of Pawnee, Oklahoma, respondent was issued a citation for serious violation on February 27, 1976, pursuant to section 9(a) of the Act. (Emphasis supplied.)

For a comparison, *see* note 4, *supra.*

9. **§ 660. Judicial review**

**Filing of petition by persons adversely affected or aggrieved; orders subject to review; jurisdiction; venue; procedure; conclusiveness of record and findings of Commission; appropriate relief; finality of judgment**

(a) Any person adversely affected or aggrieved by an order of the Commission issued under subsection (c) of section 659 of this title may obtain a review of such order in any United States court of appeals for the circuit in which the violation is alleged to have occurred or where the employer has its principal office, or in the Court of Appeals for the District of Columbia Circuit, by filing in such court within sixty days following the issuance of such order a written petition praying that the order be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Commission and to the other parties, and thereupon the Commission shall file in the court the record in the proceeding as provided in section 2112 of Title 28. Upon such filing, the court shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such

*tute v. OSHA,* 581 F.2d 493 (5th Cir. 1978); *Horce Plumbing and Heating Co. v. OSHRC,* 528 F.2d 564 (5th Cir. 1976); *Brennan v. Butler Lime and Cement Co.,* 520 F.2d 1011 (7th Cir. 1975); *Accu-Namics, Inc. v. OSHRC,* 515 F.2d 828 (5th Cir. 1975), *cert. denied* 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976); *Brennan v. OSHRC,* 419 F.2d 1340 (2d Cir. 1974).

There is substantial evidence in the record—indeed, it is uncontradicted—supporting the Commission's finding that the crane boom came within ten feet of electrical lines in violation of 29 C.F.R. 1926.-550(a)(15)(i) and that the violation was a serious one insofar as it could have and did, result in the serious injury of one Zachry employee and the death of another. We now proceed with a careful analysis of the record in order to evaluate Zachry's three challenges in this appeal.

*Was Amendment To Complaint Proper?*

The ALJ and Commission rejected Zachry's claim of prejudice due to the allowance of an amendment to OSHA's complaint at the time of the hearing. With this amendment which added the word "investigation" to "inspection" (*see* notes 4 and 8, *supra*) the ALJ admitted evidence at the hearing concerning the fatal accident. Zachry urges a violation of constitutional due process by allowing the Secretary to proceed under a citation which originally alleged an "inspection" and then introduce evidence obtained on an "investigation"— Kitchens' testimony. Zachry's position is that the Secretary should have been limited to producing evidence concerning only the actual observations of the compliance officer and, furthermore, that OSHA investigative procedures do not provide for the issuance of civil citations as a result of an "inspection". Consequently, Zachry should not have received the citation issued and the one which it did receive did not permit it to adequately prepare its defense.

■ We adopt the observations made by the ALJ and Commission that Zachry was not unduly prejudiced. It is obvious from the OSHA investigative report that Zachry was fully aware that the purpose of the complaint officer's visit was to investigate the accident.[10] Furthermore, this Court has previously held that after-the-fact observations and investigations made by OSHA officials have evidentiary weight. *Texports Stevedore Co. v. Secretary of Labor,* 484 F.2d 465 (5th Cir. 1973). Obviously, since this subsequent amendment would neither have surprised nor hindered Zachry in the preparation of its defense, we think that it was within the discretion of the ALJ to allow the amendment in this case.

■ We dispose of Zachry's second point quickly by referring to § 9(a) of 29 U.S.C.A. § 658(a)[11] which provides that "upon *in-*

temporary relief or restraining order as it deems just and proper, and to make and enter upon the pleadings, testimony, and proceedings set forth in such record a decree affirming, modifying, or setting aside in whole or in part, the order of the Commission and enforcing the same to the extent that such order is affirmed or modified.

10. The record reflects that upon arriving at the work site, February 12, the compliance officer informed the Zachry project superintendent and assistant safety director that he was there to make an investigation of the February 11 accident. He was provided with copies of employee's statements, transported to the actual site, took measurements and photos relating to the accident and interviewed Zachry's foreman.

11. § 658. Citations
   Authority to issue; grounds; contents;
   notice in lieu of citation for
   de minimis violations

(a) If, upon *inspection or investigation*, the Secretary or his authorized representative believes that an employer has violated a requirement of section 654 of this title, of any standard, rule or order promulgated pursuant to section 655 of this title, or of any regulations prescribed pursuant to this chapter, he shall with reasonable promptness issue a citation to the employer. Each citation shall be in writing and shall describe with particularity the nature of the violation, including a reference to the provision of the chapter, standard, rule, regulation, or order alleged to have been violated. In addition, the citation shall fix a reasonable time for the abatement of the violation. The Secretary may prescribe procedures for the issuance of a notice in lieu of a citation with respect to de minimis violations which have no direct or immediate relationship to safety or health. (Emphasis supplied).

*spection or investigation* the Secretary shall issue a citation to the employer when the Secretary believes the Act has been violated." (Emphasis supplied). The express language of the Act unquestionably controls over other sections of the Secretary's Field Operations Manual which Zachry cites as support for its proposition that OSHA investigation procedures do not provide for issuance of citations as a result of an investigation. In addition, the ALJ and Commission concluded that the adoption of Zachry's reasoning that an "investigation" could not lead to the issuance of citations would "seriously undercut" the enforcement scheme of § 9(a).

### Did Cited Regulation Apply?

Zachry next challenges the cited regulation, 29 C.F.R. § 1926.550(a)(15)(i) (*see* Appendix I) as inapplicable to "mobil cranes". Zachry attacks the provision on three grounds. First, subsection (a) (entitled General Requirement), of § 550 (entitled Crane and Derrick) applies to all cranes, but requires only that they be operated in accordance with the manufacturer's specifications. A careful look at the statute reveals that subsection (a) heads the list of 18 general crane safety provisions which include paragraphs (1) through (15), under which Zachry was cited. It makes no sense to conclude that only general requirements of .550(a) applicable to all cranes, applies only to paragraph (1).

Secondly, according to Zachry, mobil cranes are specifically mentioned in another regulatory section—26 C.F.R. § 1926.-550(b)(2) which was not cited by the Secretary. Based upon *Diamond Roofing v. OSHA*, 528 F.2d 645 (5th Cir. 1976), Zachry adopts the reasoning that where a term is carefully employed in one section and excluded in another it should not be implied where excluded. *Diamond*, 528 F.2d at 648. Therefore, the Secretary failed to allege or prove any violation of the specific standard applicable to mobil cranes.

We reject Zachry's reasoning and misplaced reliance on *Diamond*'s rationale which is not controlling in the instant case.

The ALJ and the Commission, as we do, read *Diamond* to stand for the proposition that when terms with "distinct meanings" are employed together in one place and not together in another, that the latter instance should be construed as an intent to exclude the omitted term. In the present case, the ALJ and the Commission reasoned that the terms "equipment and machines" found in the cited standard are general or inclusive terms encompassing the more specific term "mobil cranes". Therefore, the use of these terms, "equipment and machines," did not meet the *Diamond* situation of "distinct meanings" apart from mobil cranes. Clearly, the cited standard applies to all cranes.

Additionally, there is nothing in .550(d) which would lead us to reach the conclusion that the general requirements of .550(a) have no application to the types of cranes enumerated in .550(b). Absent such language, .550(a) must be held to apply to mobil cranes because they are cranes. Besides, .550(b) does not pertain to the safe operation of mobil cranes and electrical transmission lines.

Finally, Zachry complains that the cited standard does not apply to mobil cranes where they are actually moving and carrying a load. Zachry attempts to imply that since paragraph (15)(iii) provides specific minimum clearance for cranes in transit without a load and boom lowered, (15)(i) & (ii) cannot apply to cranes in transit *with* a load.

Where the Commission has given the regulation an interpretation well within the plain meaning of its terms, our standard of review is whether the Commission's reading is unreasonable or inconsistent with the regulation's purpose. *Brennan v. OSHRC and Fiegen*, 513 F.2d 713, 716 (8th Cir. 1975). *E. g. Udall v. Talman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965). *T. Roy Bryant Cattle Co. v. United States*, 463 F.2d 418, 420 (5th Cir. 1972). This Court has held that the "promulgator's interpretation is controlling as long as it is one of several reasonable interpretations, although it may not appear as reasonable as some other." *Brennan v. Southern Con-*

*tractors Service*, 492 F.2d 498, 501 (5th Cir. 1974).[12]

■ It is more logical and in keeping with the standard's terms and its purpose [13] to find (15)(iii) as an exception—*only* when a crane is in transit without a load—to the general rules of (15)(i) & (ii) concerning minimum clearance between cranes and electrical transmission lines whether or not the crane is loaded or in transit. It is doubtful that (15)(iii) would have been needed if (i) & (ii) were intended only to regulate cranes operating in a stationary position. For these reasons, we follow the ALJ and Commission in concluding that the cited standard does apply to the operation being performed by Zachry's mobil crane at the time of the accident.

*Was The Affirmative Defense Made Out?*

■ Zachry's final challenge and principal defense against the Secretary's citation is that it could not reasonably have prevented the isolated, negligent misconduct of crane operator Kitchens because the company had adequately trained and supervised its employees in this area of safety. In order to prevail in this defense, an employer must demonstrate that (i) all feasible steps were taken to avoid the occurrence of the hazard, *General Dynamic v. OSHRC*, 599 F.2d 453, 451 (5th Cir. 1977); *Horne Plumbing and Heating Co. v. OSHRC*, 528 F.2d at 571. This includes the training of employees as to the dangers and the supervision of the work site, *Horne*, 528 F.2d 56 at 569.

And (ii) the actions of the employee were a departure from a uniformly and effectively communicated and enforced work rule of which departure the employer had neither actual nor constructive knowledge. *See, e. g., General Dynamics*, 559 F.2d at 465; *Ames Crane and Rental Service, Inc. v. Dunlock*, 536 F.2d 123 (8th Cir. 1976).

When faced with this defense, reviewing courts have consistently looked at the record evidence of the employer's safety program. In the present case, testimony at the hearings by Zachry's safety director described the company's safety program as including (i) the showing of safety films, (ii) regular scheduled safety meetings, and (iii) the distribution of safety bulletins and materials.[14] The manual and materials included work rules, one of which required crane operators to maintain a minimum distance of ten feet from energized overhead wires as well as a rule requiring the assignment of a flag person to assist cranes moving over the job site.[15]

Zachry submitted evidence that Kitchens had signed and received these various company publications and that he had been exposed to numerous safety bulletins and films. On cross-examination, Kitchens testified that he had previously been warned about that particular power line and was familiar with the company's ten foot clearance instructions. Photographs introduced into evidence depict the ten foot clearance warning signs which were painted on the

12. *See Clarkson Construction Co. v. OSHRC*, 531 F.2d 451, 457 (10th Cir. 1976), "where two administrative bodies having expertise arrive at similar interpretations, a court should be slow to impose its own interpretation."

13. We agree with the ALJ and Commission's reasoning that since the standard's several objectives is to avoid electrical shock while using machines and equipment, "[t]o exclude the mobile crane from coverage, . . . would create an anomaly and exclude from a coverage a type of crane which is in constant use in construction and other industries." Commission's Decision.

14. The record reveals that a consistent procedure for distribution of company safety manuals [Zachry's exhibits A, B, C, D(1) and D(3)] was maintained continuously during the various periods the three subject employees

worked for Zachry. Each time an employee is hired or rehired, Zachry's testimony stated that each was indoctrinated in safety policies and programs and obtained the employee's receipt of the safety manuals given him [Zachry's exhibit D(4)].

15. Crane Safety Supervisor Rules:
    16. When moving cranes over job site a flag person is to walk ahead of crane boom to prevent collision with other equipment or contact with overhead lines. A flag person is to check the ground over which crane will move. Boom is to be kept low when traveling on unstable ground.
    Zachry Exhibit-B at 5.

inside and outside of the operator's crane cab and posted around the work site.

Although there is substantial evidence that Zachry had a safety program and work rules requiring cranes to maintain a minimum of ten feet clearance from energized power lines, the ALJ and Commission found deficiencies in the communication and enforcement of the rule. Kitchens testified that he skipped about one-half of the regularly scheduled safety meetings yet would sign an attendance roster for fear that he would lose his job.

An even more glaring deficiency was the inadequacy of supervision given Kitchens and his two helpers the day of the accident. Zachry's "Supervisor's Rules for Safe Operation of Cranes" stated the following principles:

1. Power cranes and excavators are powerful and complex machines. Your complete attention to control is required every minute.

2. You—as the man responsible for all operations under your control—are the crucial key to safe machine performance.

3. Do not operate or allow to be operated any machine under your control until you fully understand the operator's manual.

Zachry Exhibit–B at 1.

According to the uncontradicted testimony of Kitchens, his supervisor was actually present when he began loading the pipes on the crane. Practically speaking, it is undisputed that the only way the ten foot minimum clearance standard could have been met was by shortening the cables which were wrapped around the pipes. The fact that the supervisor apparently failed to instruct Kitchens to make that adjustment or to specifically designate one of the two helpers to give hand signals to Kitchens, (see, note 15, supra) permits the inference that the supervisor lacked familiarity with the manual's rules.[16] This fact becomes particularly significant since this was Kitchens' first attempt to carry a load with this particular crane under these power lines. Apparently, the ALJ and Commission found Kitchens was given little guidance and instruction—evidence which independently demonstrates the ineffective communication and enforcement of the company work rules. Further, this Court has previously stated the "behavior of supervisory personnel sets an example at the work place, an employer has—if anything a heightened duty to ensure the proper conduct of such personnel," Floyd S. Pike Electrical Contractors Inc. v. OSHRC, 576 F.2d 72, 77 (5th Cir. 1978), citing National Realty and Construction Company, Inc. v. OSHRC, 489 F.2d 1257, 1267 n. 38 (5th Cir. 1973). Assuming, arguendo, that the supervisor was familiar with this particular company rule, his noncompliance with it is additional evidence that the implementation of the rule was lax. Id. Thus the company's attempted defense of employee negligent misconduct fails because of the employer's inability to establish to the satisfaction of the factfinder that it effectively communicated and enforced work rules which were necessary to ensure compliance with OSHA standards.[17]

---

**16.** 22. Operator and supervisor shall check conditions when working near power lines. Where power can't be cut off a minimum distance of 10-ft. must be maintained between equipment, loads, and power lines. Zachry Exhibit -B at 6.

**17.** Since Zachry did not qualify for the employee misconduct affirmative defense, its contention that the citation should be vacated because the record does not demonstrate that the company with the exercise of reasonable diligence could have known of the presence of the violation is meritless. An examination of the elements of the employee misconduct affirmative defense reveals that it is designed to demonstrate that an employer exercised reasonable diligence by providing adequate safety training and supervision to its employees. Thus, an employer's inability to establish the adequacy of the safety instructions to his employee shows a failure to exercise reasonable diligence. In a case involving the same standard as the case at bar, the Court rejected the employer's defense of employee misconduct, finding that the company had failed to "take adequate precautionary steps to instruct and train employees to protect against reasonable foreseeable dangers," Ames Crane and Rental Service, 532 F.2d at 125. The Eighth Circuit in a case identical to Ames Crane stated that an

## Conclusion

Because we find substantial evidence in the record as a whole that (i) the amended complaint did not prejudice Zachry's defense against the Secretary's citation, (ii) the Secretary reasonably interpreted the cited standard to apply to mobil cranes in transit with a load, and (iii) Zachry failed in establishing the defense of negligent employee misconduct because of its ineffectual communication and enforcement of company work rules which were needed to comply with OSHA standards, we sustain the findings of the ALJ and the final order of the Commission.

AFFIRMED.

## APPENDIX I

### Subpart N—Cranes, Derricks, Hoists, Elevators, and Conveyors

§ 1926.550 Cranes and derricks.

(a) *General requirements.* (1) The employer shall comply with the manufacturer's specifications and limitations applicable to the operation of any and all cranes and derricks. Where manufacturer's specifications are not available, the limitations assigned to the equipment shall be based on the determinations of a qualified engineer competent in this field and such determinations will be appropriately documented and recorded. Attachments used with cranes shall not exceed the capacity, rating, or scope recommended by the manufacturer.

(2) Rated load capacities, and recommended operating speeds, special hazard warnings, or instruction, shall be conspicuously posted on all equipment. Instructions or warnings shall be visible to the operator while he is at his control station.

(3) [Reserved]

(4) Hand signals to crane and derrick operators shall be those prescribed by the applicable ANSI standard for the type of crane in use. An illustration of the signals shall be posted at the job site.

(5) The employer shall designate a competent person who shall inspect all machinery and equipment prior to each use, and during use, to make sure it is in safe operating condition. Any deficiencies shall be repaired, or defective parts replaced, before continued use.

(6) A thorough, annual inspection of the hoisting machinery shall be made by a competent person, or by a government or private agency recognized by the U.S. Department of Labor. The employer shall maintain a record of the dates and results of inspections for each hoisting machine and piece of equipment.

(7) Wire rope shall be taken out of service when any of the following conditions exist:

(i) In running ropes, six randomly distributed broken wires in one lay or three broken wires in one strand in one lay;

(ii) Wear of one-third the original diameter of outside individual wires. Kinking, crushing, bird caging, or any other damage resulting in distortion of the rope structure;

(iii) Evidence of any heat damage from any cause;

(iv) Reductions from nominal diameter of more than one-sixty-fourth inch for diameters up to and including five-sixteenths inch, one-thirty-second inch for diameters three-eighths inch to and including one-half inch, three-sixty-fourths inch for diameters nine-sixteenths inch to and including three-fourths inch, one-sixteenth inch for diameters seven-eighths inch to 1⅛ inches inclusive, three-thirty-seconds inch for diameters 1¼ to 1½ inches inclusive;

(v) In standing ropes, more than two broken wires in one lay in sections beyond end connections or more than one broken wire at an end connection.

(vi) Wire rope safety factors shall be in accordance with American National Standards Institute B 30.5–1968 or SAE J959–1966.

employer "cannot fail to properly train and supervise its employees and then hide behind its lack of knowledge concerning their dangerous work practices." *Danco Construction Co. v. OSHRC and Secretary*, 586 F.2d 1243, 1247 (8th Cir. 1978).

(8) Belts, gears, shafts, pulleys, sprockets, spindles, drums, fly wheels, chains, or other reciprocating, rotating, or other moving parts or equipment shall be guarded if such parts are exposed to contact by employees, or otherwise create a hazard. Guarding shall meet the requirements of the American National Standards Institute B 15.1–1958 Rev., Safety Code for Mechanical Power Transmission Apparatus.

(9) Accessible areas within the swing radius of the rear of the rotating superstructure of the crane, either permanently or temporarily mounted, shall be barricaded in such a manner as to prevent an employee from being struck or crushed by the crane.

(10) All exhaust pipes shall be guarded or insulated in areas where contact by employees is possible in the performance of normal duties.

(11) Whenever internal combustion engine powered equipment exhausts in enclosed spaces, tests shall be made and recorded to see that employees are not exposed to unsafe concentrations of toxic gases or oxygen deficient atmospheres.

(12) All windows in cabs shall be of safety glass, or equivalent, that introduces no visible distortion that will interfere with the safe operation of the machine.

(13)(i) Where necessary for rigging or service requirements, a ladder, or steps, shall be provided to give access to a cab roof.

(ii) Guardrails, handholds, and steps shall be provided on cranes for easy access to the car and cab, conforming to American National Standards Institute B30.5.

(iii) Platforms and walkways shall have anti-skid surfaces.

(14) Fuel tank filler pipe shall be located in such a position, or protected in such manner, as to not allow spill or overflow to run onto the engine, exhaust, or electrical equipment of any machine being fueled.

(i) An accessible fire extinguisher of 5BC rating, or higher, shall be available at all operator stations or cabs of equipment.

(ii) All fuels shall be transported, stored, and handled to meet the rules of Subpart F of this part. When fuel is transported by vehicles on public highways, Department of Transportation rules contained in 49 CFR Parts 177 and 393 concerning such vehicular transportation are considered applicable.

(15) Except where electrical distribution and transmission lines have been de-energized and visibly grounded at point of work or where insulating barriers, not a part of or an attachment to the equipment or machinery, have been erected to prevent physical contact with the lines, equipment or machines shall be operated proximate to power lines only in accordance with the following:

(i) For lines rated 50 kV. or below, minimum clearance between the lines and any part of the crane or load shall be 10 feet;

(ii) For lines rated over 50 kV., minimum clearance between the lines and any part of the crane or load shall be 10 feet plus 0.4 inch for each 1 kV. over 50 kV., or twice the length of the line insulator, but never less than 10 feet;

(iii) In transit with no load and boom lowered, the equipment clearance shall be a minimum of 4 feet for voltages less than 50 kV., and 10 feet for voltages over 50 kV., up to and including 345 kV., and 16 feet for voltages up to and including 750 kV.

(iv) A person shall be designated to observe clearance of the equipment and give timely warning for all operations where it is difficult for the operator to maintain the desired clearance by visual means;

(v) Cage-type boom guards, insulating links, or proximity warning devices may be used on cranes, but the use of such devices shall not alter the requirements of any other regulation of this part even if such device is required by law or regulation;

(vi) Any overhead wire shall be considered to be an energized line unless and until the person owning such line or the electrical utility authorities indicate that it is not an energized line and it has been visibly grounded;

(vii) Prior to work near transmitter towers where an electrical charge can be induced in the equipment or materials being handled, the transmitter shall be de-energized or tests shall be made to determine if electrical charge is induced on the crane. The following precautions shall be taken when necessary to dissipate induced voltages:

(*a*) The equipment shall be provided with an electrical ground directly to the upper rotating structure supporting the boom; and

(*b*) Ground jumper cables shall be attached to materials being handled by boom equipment when electrical charge is induced while working near energized transmitters. Crews shall be provided with nonconductive poles having large alligator clips or other similar protection to attach the ground cable to the load.

(*c*) Combustible and flammable materials shall be removed from the immediate area prior to operations.

(16) No modifications or additions which affect the capacity or safe operation of the equipment shall be made by the employer without the manufacturer's written approval. If such modifications or changes are made, the capacity, operation, and maintenance instruction plates, tags, or decals, shall be changed accordingly. In no case shall the original safety factor of the equipment be reduced.

(17) The employer shall comply with Power Crane and Shovel Association Mobile Hydraulic Crane Standard No. 2.

(18) Sideboom cranes mounted on wheel or crawler tractors shall meet the requirements of SAE J743a–1964.

(b) *Crawler, locomotive, and truck cranes.* (1) All jibs shall have positive stops to prevent their movement of more than 5° above the straight line of the jib and boom on conventional type crane booms. The use of cable type belly slings does not constitute compliance with this rule.

(2) All crawler, truck, or locomotive cranes in use shall meet the applicable requirements for design, inspection, construction, testing, maintenance and operation as prescribed in the ANSI B30.5–1968, Safety Code for Crawler, Locomotive and Truck Cranes.

(c) *Hammerhead tower cranes.* (1) Adequate clearance shall be maintained between moving and rotating structures of the crane and fixed objects to allow the passage of employees without harm.

(2) Employees required to perform duties on the horizontal boom of hammerhead tower cranes shall be protected against falling by guardrails or by safety belts and lanyards attached to lifelines in conformance with Subpart E of this part.

(3) Buffers shall be provided at both ends of travel of the trolley.

(4) Cranes mounted on rail tracks shall be equipped with limit switches limiting the travel of the crane on the track and stops or buffers at each end of the tracks.

(5) All hammerhead tower cranes in use shall meet the applicable requirements for design, construction, installation, testing, maintenance, inspection, and operation as prescribed by the manufacturer.

(d) *Overhead and gantry cranes.* (1) The rated load of the crane shall be plainly marked on each side of the crane, and if the crane has more than one hoisting unit, each hoist shall have its rated load marked on it or its load block, and this marking shall be clearly legible from the ground or floor.

(2) Bridge trucks shall be equipped with sweeps which extend below the top of the rail and project in front of the truck wheels.

(3) Except for floor-operated cranes, a gong or other effective audible warning signal shall be provided for each crane equipped with a power traveling mechanism.

(4) All overhead and gantry cranes in use shall meet the applicable requirements for design, construction, installation, testing, maintenance, inspection, and operation as prescribed in the ANSI B30.2.0–1967, Safety Code for Overhead and Gantry Cranes.

(e) *Derricks.* All derricks in use shall meet the applicable requirements for design, construction, installation, inspection, testing, maintenance, and operation as prescribed in American National Standards Institute B30.6–1969, Safety Code for Derricks.

(f) *Floating cranes and derricks—(1) Mobile cranes mounted on barges.* (i) When a mobile crane is mounted on a barge, the rated load of the crane shall not exceed the original capacity specified by the manufacturer.

(ii) A load rating chart, with clearly legible letters and figures, shall be provided with each crane, and securely fixed at a location easily visible to the operator.

(iii) When load ratings are reduced to stay within the limits for list of the barge with a crane mounted on it, a new load rating chart shall be provided.

(iv) Mobile cranes on barges shall be positively secured.

(2) *Permanently mounted floating cranes and derricks.* (i) When cranes and derricks are permanently installed on a barge, the capacity and limitations of use shall be based on competent design criteria.

(ii) A load rating chart with clearly legible letters and figures shall be provided and securely fixed at a location easily visible to the operator.

(iii) Floating cranes and floating derricks in use shall meet the applicable requirements for design, construction, installation, testing, maintenance, and operation as prescribed by the manufacturer.

(3) *Protection of employees working on barges.* The employer shall comply with the applicable requirements for protection of employees working on-board marine vessels specified in § 1926.605.