**DANIEL INTERNATIONAL CORPORATION,**
**Petitioner,**

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and the Secretary of Labor, Respondents.**

**No. 81–7602.**

United States Court of Appeals, Eleventh Circuit.

Aug. 19, 1982.

Thompson, Mann & Hutson, George A. Harper, Greenville, S.C., for petitioner.

Counsel for Regional Litigation, Charles I. Hadden, Thomas L. Holzman, U. S. Dept. of Labor, Edward G. Hoban, Earl R. Ohman, Jr., Occupational Safety & Health Review Commission, Washington, D.C., for respondents.

---

Before GOLDBERG *, HILL and HATCHETT, Circuit Judges.

JAMES C. HILL, Circuit Judge:

Daniel International Corp. petitions this court to review an order of the Occupational Safety and Health Review Commission citing the company for a violation of 29 C.F.R. § 1926.28(a).[1] The Commission maintains that Daniel's failure to take all steps necessary to insure that its employees wear personal protective equipment, resulted in a fatal accident at the company's Macon, Georgia construction site. Because we find that Daniel took all steps feasible to assure compliance with safety regulations, we conclude that the Commission's citation is not supported by substantial evidence on the record.

I.

Daniel is a construction company which employs 700 employees, 175 of whom are ironworkers. In October, 1975, the company was constructing a tobacco plant for Brown and Williamson Co. in Macon, Georgia. As part of the project, ironworkers were to erect permanent catwalks around air conditioning systems located in various areas of the building. George Woolsey was the company's iron crew foreman at the Macon site, and was in charge of the seventeen man crew assigned to erect the catwalks.

On October 16, 1975, at 4:15 in the afternoon, Woolsey assigned Clyde Cannon, Robert Lamkin, Claude Taylor, and leadman Bruce Rule the task of removing a temporary catwalk and placing it where a new section of permanent catwalk would be installed the next day. Woolsey carefully instructed his crew to use a scissor lift to move the temporary catwalk through the

---

* Honorable Irving L. Goldberg, U. S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. 29 C.F.R. § 1926.28 *Personal Protective Equipment*

(a) The employer is responsible for requiring the wearing of appropriate personal protective equipment in all operations where there is an exposure to hazardous conditions or where this part indicates the need for using such equipment to reduce the hazards to the employees.

structural steel.[2] The men were not supposed to slide the catwalk over the structural steel. Woolsey further instructed the crew to tie off their safety belts while up on the structural steel and while on the scissor lift. Daniel safety rules require that safety belts be worn and tied off whenever employees perform elevated work.[3]

As Woolsey watched, the crew moved the scissor lift into position directly beneath the catwalk. Because everything appeared to be under control, Woolsey then returned to his desk which was about ninety feet away from the work area. Unfortunately, this was the last assignment on a pay day, and the men were in a hurry. In their haste, and contrary to all instructions, they chose the faster method of moving the catwalk, and attempted to slide it across the structural steel rather than using the slower but safer scissor lift method. Cannon and Taylor, who were standing on the elevated duct walk slid the catwalk toward Rule and Lamkin who also were up in the steel. The catwalk, however, accidentally struck Lamkin at the knee causing him to lose his balance. As a result, Lamkin fell thirty-seven feet to a cement floor and died. At the time of the accident all four men were wearing safety belts, but all four had neglected to tie off as Woolsey had instructed, and as required by Daniel safety rules. This was despite the fact that they could have attached their safety belts to a number of nearby locations.[4]

Following an investigation on October 17, 1975, the Secretary of Labor filed a complaint alleging that Daniel "failed to assure the wearing of appropriate personal protective equipment" in violation of 29 C.F.R. § 1926.28(a).[5] Daniel contested the citation and an evidentiary hearing was held on February 26, 1976 before an Administrative Law Judge (ALJ). The ALJ dismissed the citation by concluding that the failure of the four crewmembers to tie off was an isolated incident which could not have been foreseen by Daniel. In support of this conclusion, the ALJ pointed to Daniel's "strongly stressed and enforced safety programs which included regular meetings at which the tie-off rule was always emphasized." The Occupational Safety and Health Review Commission, however, concluded that Daniel failed to establish an affirmative defense of isolated incident of employee misconduct, and reversed the decision of the ALJ.

## II.

◼ In evaluating the decision of the Commission, we recognize that its findings and conclusions must be upheld if supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 660(a) (1976); *Cleveland Consolidated, Inc. v. OSHRC*, 649 F.2d 1160, 1167 (5th Cir. 1981); *H. B. Zachry Co. v. OSHRC*, 638 F.2d 812,

---

2. This procedure involves sliding the temporary catwalk through the structural steel and on to the scissor lift. It is then fastened to the lift and moved by the lift to the position where it is to re-enter the structural steel.

3. Daniel published a safety manual which is distributed to all employees. The provision relating to the use of safety belts reads as follows:

  B. Safety Belts
    1. *Required* to be worn and tied off when working on:
      a. Sloping roofs
      b. Flat roofs without handrails within 4 feet of the edge or roof opening.
      c. Any suspended platform or stage
      d. Any scaffold with incomplete handrail or decking
      e. Ladders near edge of roofs and floor openings.

      f. Generally, elevated work without protection to keep you from falling
    2. How to Wear
      a. Arrange so the "D" ring is in the rear.
      b. Not to be used for support or as a lineman's belt.
      c. Tie off to immovable objects overhead and as short as possible. Maximum fall—6 feet. Learn the correct knot (bowline or stopper hitch recommended).

4. One such location was within three feet of Lamkin at the time he was struck.

5. The original charge against Daniel included a violation of § 5(a)(1) of the Occupational Safety and Health Act and a penalty assessment of $4,000. That charge was amended to allege only the violation of 29 C.F.R. § 1926.28(a).

815 (5th Cir. 1981); *Accu-Namics, Inc. v. OSHRC*, 515 F.2d 828, 834–35 (5th Cir. 1975), *cert. denied*, 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976). Nevertheless, the effectiveness of Daniel's safety program, as evidenced by the record, negates any conclusion that the company violated 29 C.F.R. § 1926.28(a).

Daniel maintains that the accident on October 16, 1975 was the product of isolated and negligent misconduct on the part of four employees who simply wanted to get their paycheck and go home early. To prevail on this affirmative defense, Daniel must demonstrate that it took all feasible steps to prevent the accident, and that the actions of its employees were a departure from a uniformly and effectively communicated and enforced work rule of which departure Daniel had neither actual nor constructive knowledge. *H. B. Zachry Co. v. OSHRC*, 638 F.2d 812, 818 (5th Cir. 1981); *see General Dynamics Corp. v. OSHRC*, 599 F.2d 453 (1st Cir. 1979); *Horne Plumbing & Heating Co. v. OSHRC*, 528 F.2d 564 (5th Cir. 1976). Daniel points to several crucial findings in the record which indicate that the company effectively supports and enforces a strong safety program.

When Daniel employees are hired, they are given full instructions on all of Daniel safety rules. They also receive a published pamphlet outlining each of the rules and describing in detail compliance standards. As a follow up to this preliminary training program, employees attend safety meetings every Monday for half an hour. At these meetings, the need to tie off safety belts whenever an employee is over ten feet off the floor always is emphasized. The company also provides all necessary safety equipment. Thus, we have little doubt that Daniel has a work rule requiring employees to tie off and which is communicated effectively to all of its employees.

The only real question on appeal is whether Daniel took all feasible steps to prevent employee misconduct. The Commission concludes that, because all four men involved in the accident had failed to tie off, tie off violations by Daniel employees were frequent. The Commission acknowledges that Daniel discharged employees for violating tie off rules, but argues that Daniel failed to communicate these discharges to other employees. Finally, the Commission maintains that Daniel enforcement practices are not uniform.

The evidence, however, overwhelmingly points to the conclusion that Daniel is a company which takes its safety program seriously and indeed took all steps to enforce its safety rules effectively. Initially, Daniel employs a full time safety engineer at construction sites whose primary duty is to enforce the company's safety rules. Any employee who violates the tie off rule is reprimanded immediately, and prior to this accident, seven Daniel employees had been terminated for failing to comply with the rule.[6] Although the Commission notes that two of the ironworkers involved in the accident were unaware of the specific employee discharges, both employees were aware of the safety rule, and that a failure to tie off was grounds for termination. In addition, the company's foreman, George Woolsey, each morning had his crewmembers check their safety equipment, and during the course of the day Woolsey would check his workers seven to ten times to be certain they were tied off. Daniel also points to the fact that just two days prior to the accident, an OSHA compliance officer inspected the construction site and evaluated Daniel's safety program. The compliance officer found all the employees tied off and concluded that Daniel's enforcement of its safety rules was "effective."

Finally, the Commission attempts to prove that Daniel was aware of a lax atti-

---

**6.** The Commission argues that because some employees were reprimanded and others terminated, Daniel's safety rules were not uniformly enforced. This view fails to account for differing circumstances under which a violation may occur. Those employees who were reprimanded may represent less serious or first time offenders. This type of graduated enforcement does not weaken the overall effectiveness of the program; it merely recognizes mitigating circumstances.

tude toward its tie off rule by the fact that on two prior occasions a member of leadman Bruce Rule's crew was reprimanded for failing to tie off, and that Rule himself was not tied off at the time of the accident. Although we acknowledge that noncompliance by a supervisor suggests lax enforcement of a safety rule,[7] Rule's position as leadman did not place him in a supervisory role. Rule did not have the power to hire or fire, he did not earn more than the other crewmembers, he did not wear a white hat (indication of a supervisory position), and his fellow crewmembers did not consider him to be a supervisor. Rule was not directly responsible for enforcement of the safety rules; rather, Woolsey was the man in charge, and he did everything except lead the crew by the hand.[8] Woolsey made sure the crew members had safety belts, and he told them to tie off. He clearly instructed the crew to move the catwalk with the scissor lift, and even remained with them until the scissor lift was positioned below.

The accident which occurred at Daniel's construction site was unfortunate, but the record clearly reflects that Daniel took all feasible steps to prevent it. Because we find that the Commission's decision to cite Daniel for a violation of 29 C.F.R. § 1926.-28(a) is not supported by substantial evidence on the record, we set aside the order.[9]

---

**7.** *See H. B. Zachary Co.*, 638 F.2d at 819; *Floyd S. Pike Electrical Contractor, Inc. v. OSHRC*, 576 F.2d 72, 77 (5th Cir. 1978); *National Realty & Construction Co. v. OSHRC*, 489 F.2d 1257, 1267 n.38 (D.C.Cir.1973).

**8.** It would be unreasonable to require Woolsey to remain and watch the crew's every move. *See Capital Electric Line Builders, Inc. v. Marshall*, 678 F.2d 128, 131 (10th Cir. 1982); *Horne*

*Plumbing & Heating Co. v. OSHRC*, 528 F.2d 564, 569 (5th Cir. 1976).

**9.** Daniel also challenges the validity of 29 C.F.R. § 1926.28 by questioning the circumstances surrounding its promulgation; however, because we find no violation we need not address this issue.